KENNETH H. VAN RADEN AND SUSAN L. VAN RADEN,
PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

FRED F. VAN RADEN AND CORINNE B. VAN RADEN,
PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket Nos. 1336–76, 1407–76.     Filed March 29, 1979.

*Cyril David Kasmir,* for the petitioners.
*Michael J. O'Brien,* for the respondent.

GOFFE, *Judge:* The Commissioner determined deficiencies in Federal income tax of petitioners as follows:

| Docket No. | Taxable year | Amount |
|---|---|---|
| 1336–76 | 1972 | $97,763.00 |
| 1407–76 | 1972 | 108,775.80 |

Upon the joint motion of the parties, these cases were consolidated for purposes of trial, briefs, and opinion.

Due to concessions, the only issue remaining for our decision is: Whether Western Trio-VR, a limited partnership, of which petitioners were the limited partners, is entitled to deduct in the year of purchase and payment the cost of a 1-year supply of feed, purchased for its cattle-feeding operations, which was consumed by the cattle in the taxable year following the year of purchase.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulations of facts with attached exhibits are found as facts and incorporated

herein by reference. Of the stipulated facts only those necessary to an understanding of the opinion will be repeated herein.

Petitioner Kenneth H. Van Raden and his wife, Susan L. Van Raden, timely filed their joint Federal income tax return for the taxable year 1972 with the District Director of Internal Revenue at Ogden, Utah. At the time of the filing of their petition they resided at Hillsboro, Ore.

Petitioner Fred F. Van Raden and his wife, Corinne B. Van Raden, timely filed their joint Federal income tax return for the taxable year 1972 with the office of the Internal Revenue Service Center at Ogden, Utah. They resided at Hillsboro, Ore., at the time of filing their petition.

Prior to July 1972, petitioners owned shares of stock in Peerless Trailer & Truck Services, Inc., as follows:

| Name of owner | Number of shares |
|---|---|
| Kenneth H. Van Raden | 1,535 |
| Kenneth H. and Susan L. Van Raden as joint tenants with right of survivorship | 135 |
| Total shares | 1,670 |
| Fred F. Van Raden | 762 |
| Fred F. and Corinne B. Van Raden as joint tenants with right of survivorship | 1,219 |
| Total shares | 1,981 |

In July 1972, petitioners sold their shares of stock in Peerless. They realized and reported long-term capital gain in the amounts of $2,154,501 (Kenneth and his wife Susan), and $2,482,458 (Fred and his wife Corinne). Petitioners wanted to invest the proceeds from the sale of their stock and to this end they examined various investment possibilities. One investment opportunity presented to them by a Portland, Ore., brokerage firm was a cattle-feeding operation. In the autumn of 1972 petitioners discussed investing in a cattle-feeding program with Clark S. Willingham who represented Western Trio Cattle Co. (Western Trio). Petitioners considered the potential profit, potential tax benefit, and the cash required to invest in a Western Trio cattle-feeding program.

Petitioners as limited partners and Western Trio as the general partner organized a limited partnership, Western Trio-VR

(Trio-VR), on December 26, 1972. The investments of petitioners in Trio-VR were made pursuant to a Private Placement Memorandum dated December 13, 1972. The limited partnership interests in Trio-VR and the related Private Placement Memorandum were exempt from registration with the Securities and Exchange Commission under section 4(2) of the Securities Act of 1933.

Petitioner Kenneth H. Van Raden and petitioner Fred F. Van Raden each contributed $150,000 to Trio-VR. Under the terms of the partnership agreement all of the losses and all of the profits and gains due the limited partners were allocated to the limited partners in the ratio of their respective capital contributions. Any profits withdrawn prior to 3 years were allocated 85 percent to the redeeming limited partner and 15 percent to the general partner. As to the proportion of the limited partner's capital contribution which remains in the partnership for a minimum of 3 years, the limited partner had allocated to his account, on a year-by-year cumulative basis, an amount which recovers any similarly proportionate charges to such limited partner's account, plus 25 percent of such proportion of the limited partner's contribution, if profits and gains are sufficient to permit such allocation. After such allocation, the remaining profits and gains were allocated 85 percent to the limited partners and 15 percent to the general partner. Western Trio, the general partner in Trio-VR, is a general partnership that was organized under the laws of Oklahoma on June 1, 1972. Its principal place of business is Guymon, Okla. The partners of Western Trio were H. C. Hitch, Jr., Paul H. Hitch, and Clark S. Willingham. It was organized to seek investments in cattle for profit and to act as a general partner in limited partnerships to be offered in private placements and public offerings. The limited partnerships were presented to investors as "programs" and were designed to take advantage of tax benefits which, in its opinion, were available in farming operations. Western Trio was engaged in the business of purchasing, grazing, feeding, and selling cattle on behalf of the limited partnerships of which it was the general partner. Trio-VR was organized to purchase, graze, feed, and sell cattle, which it did.

Petitioners, as limited partners, made no business decisions of Trio-VR. Instead, all of the business decisions, which included the purchase of feed and cattle and the sale of cattle, were made

by F. Edward Herron, the general manager of Western Trio, and by H. C. Hitch., Jr. Mr. Hitch has been engaged in the farming business all of his life which has included raising crops and buying, feeding, and selling cattle. In 1965, Mr. Hitch was honored as cattle feeder of the year by "Feed Lot Magazine."

On December 26, 1972, Trio-VR purchased and paid for the following amounts of feed to be used in its cattle-feeding operations:

(a) 4,716,981 pounds of silage at $0.0053 per pound, or $25,000 from Master Feeders, Inc. (Master Feeders).

(b) 10,640,000 pounds of corn at $0.03152 per pound, or $335,400 from Feeders Grain & Fertilizer, Inc. (Feeders Grain).

H. C. Hitch, Jr., and his brother, Paul H. Hitch, were officers of both Master Feeders and Feeders Grain in 1972, 1973, and 1974. For the same period they were the sole shareholders of Master Feeders and together owned 71 percent of Feeders Grain.

Trio-VR operated its business in Hooker, Okla., which is located in the "Oklahoma Panhandle" near Guymon, Okla. The price of feed in the Guymon area varied directly with grain prices in Kansas City, Mo., and Chicago, Ill. The cash prices per bushel of No. 2 yellow corn on the Kansas City grain market were as shown in Table I on page 1087. The cash prices per bushel of No. 2 yellow corn on the Chicago grain market were as shown in Table II on page 1088.

Trio-VR purchased the feed in December 1972 because generally the price is lower at that point in time than in succeeding months until the next grain harvest. Trio-VR calculated the December 1972 purchase to be its needs for 1 year. It has been Mr. Hitch's practice to purchase a year's supply of feed at one time in the autumn months. The amount of feed purchased was based upon projections of the number of head of cattle to be fed over the next year and the anticipated rate of consumption, not the income tax deductions to be generated by the purchase. The estimated needs were 40 to 45 bushels of feed per head of cattle. The operation anticipated purchasing "feeder" cattle which weighed from 650 to 1,150 pounds, feeding them for 150 days and selling them.

Also, on December 26, 1972, Trio-VR purchased and paid for 149 head of cattle from Five Flags Cattle Co., Inc. (Five Flags), for $56,672.76. Seventy-five percent of the capital stock of Five

TABLE I

CASH PRICES FOR CORN NO. 2 YELLOW — KANSAS CITY

(PER BUSHEL)

| Year beginning Oct. | Oct. | Nov. | Dec. | Jan. | Feb. | Mar. | Apr. | May | June | July | Aug. | Sept. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1955 | $1.32 | $1.30 | $1.38 | $1.37 | $1.41 | $1.43 | $1.59 | $1.62 | $1.61 | $1.65 | $1.62 | $1.48 |
| 1956 | 1.38 | 1.41 | 1.39 | 1.34 | 1.32 | 1.33 | 1.38 | 1.39 | 1.38 | 1.43 | 1.34 | 1.21 |
| 1957 | 1.16 | 1.21 | 1.16 | 1.13 | 1.11 | 1.16 | 1.23 | 1.29 | 1.34 | 1.33 | 1.29 | 1.18 |
| 1958 | 1.11 | 1.11 | 1.12 | 1.12 | 1.12 | 1.13 | 1.21 | 1.24 | 1.28 | 1.25 | 1.23 | 1.16 |
| 1959 | 1.16 | 1.09 | 1.08 | 1.15 | 1.13 | 1.16 | 1.18 | 1.18 | 1.19 | 1.22 | 1.19 | 1.11 |
| 1960 | 1.06 | .99 | 1.05 | 1.09 | 1.10 | 1.09 | 1.04 | 1.11 | 1.14 | 1.17 | 1.15 | 1.15 |
| 1961 | 1.15 | 1.18 | 1.12 | 1.09 | 1.04 | 1.13 | 1.14 | 1.15 | 1.18 | 1.18 | 1.13 | 1.16 |
| 1962 | 1.19 | 1.15 | 1.21 | 1.25 | 1.25 | 1.24 | 1.21 | 1.22 | 1.31 | 1.32 | 1.31 | 1.29 |
| 1963 | 1.19 | 1.22 | 1.24 | 1.25 | 1.24 | 1.27 | 1.29 | 1.31 | 1.29 | 1.26 | 1.28 | 1.33 |
| 1964 | 1.27 | 1.26 | 1.32 | 1.33 | 1.33 | 1.34 | 1.36 | 1.35 | 1.34 | 1.33 | 1.28 | 1.26 |
| 1965 | 1.21 | 1.21 | 1.30 | 1.34 | 1.32 | 1.25 | 1.32 | 1.31 | 1.31 | 1.40 | 1.45 | 1.43 |
| 1966 | 1.39 | 1.39 | 1.42 | 1.40 | 1.37 | 1.38 | 1.34 | 1.35 | 1.36 | 1.33 | 1.24 | 1.22 |
| 1967 | 1.20 | 1.17 | 1.19 | 1.22 | 1.22 | 1.24 | 1.22 | 1.25 | 1.23 | 1.21 | 1.14 | 1.13 |
| 1968 | 1.14 | 1.19 | 1.16 | 1.20 | 1.21 | 1.33 | 1.25 | 1.33 | 1.31 | 1.29 | 1.28 | 1.22 |
| 1969 | 1.24 | 1.23 | 1.23 | 1.28 | 1.29 | 1.26 | 1.29 | 1.30 | 1.34 | 1.34 | 1.42 | 1.46 |
| 1970 | 1.41 | 1.42 | 1.50 | 1.52 | 1.51 | 1.50 | 1.50 | 1.52 | 1.55 | 1.50 | 1.33 | 1.18 |
| 1971 | 1.15 | 1.16 | 1.27 | 1.27 | 1.26 | 1.28 | 1.30 | 1.32 | 1.31 | 1.31 | 1.28 | 1.35 |

TABLE II

CASH PRICES FOR CORN No. 2 YELLOW — CHICAGO

(PER BUSHEL)

| Year beginning Oct. | Oct. | Nov. | Dec. | Jan. | Feb. | Mar. | Apr. | May | June | July | Aug. | Sept. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1965 | $1.23 | $1.16 | $1.24 | $1.32 | $1.31 | $1.28 | $1.28 | $1.31 | $1.33 | $1.43 | $1.49 | $1.46 |
| 1966 | 1.40 | 1.35 | 1.45 | 1.42 | 1.41 | 1.41 | 1.38 | 1.39 | 1.38 | 1.31 | 1.23 | 1.20 |
| 1967 | 1.17 | 1.10 | 1.14 | 1.13 | 1.15 | 1.17 | 1.16 | 1.19 | 1.15 | 1.13 | 1.08 | 1.09 |
| 1968 | 1.09 | 1.15 | 1.16 | 1.20 | 1.18 | 1.17 | 1.24 | 1.32 | 1.31 | 1.29 | 1.30 | 1.24 |
| 1969 | 1.21 | 1.18 | 1.19 | 1.26 | 1.26 | 1.24 | 1.28 | 1.32 | 1.37 | 1.38 | 1.46 | 1.52 |
| 1970 | 1.42 | 1.42 | 1.54 | 1.59 | 1.57 | 1.55 | 1.51 | 1.52 | 1.57 | 1.48 | 1.29 | 1.16 |
| 1971 | 1.10 | 1.07 | 1.22 | 1.22 | 1.21 | 1.22 | 1.26 | 1.28 | 1.25 | 1.29 | 1.29 | 1.40 |

Flags is owned equally by H. C. Hitch, Jr., Paul H. Hitch, and Clark S. Willingham.

None of the feed purchased by Trio-VR on December 26, 1972, was consumed by the cattle in 1972. The feed was not delivered to the feedlot at one time but was delivered as needed. By the end of 1973, the cattle had consumed 10,460,258 pounds of corn or 98.31 percent of the corn purchased in December 1972, and 4,297,522 pounds of silage or 91.11 percent of the silage purchased in December 1972. The balance of the silage was consumed by the cattle in 1974, but not all of the corn was consumed in 1974; corn costing $32,490 was sold in June 1974.

On December 26, 1972, Trio-VR executed two promissory notes to the First National Bank & Trust Co. of Oklahoma City, Okla., totaling $1,668,900 secured by livestock, feed, contracts for the same, and other assets owned or to be acquired. In addition, the notes were secured by subordination agreements from Master Feeders, and Master Feeders II, Inc., corporations related by ownership to Western Trio and Five Flags. Of the total funds available from the loans, Trio-VR borrowed $214,072.76 in 1972. During 1973, there were repayments on the notes and additional sums borrowed which left a balance due the bank on December 31, 1973, of $859,915.66.

During 1973, Trio-VR purchased the following quantities of corn from Master Commodities Co., Inc. (Master Commodities):

| Date | Amount | Cost per pound | Total cost |
|------|--------|----------------|------------|
| 11/16/73 | 504,000 lbs. | $0.05754 | $29,000 |
| 11/29/73 | 168,000 lbs. | 0.05018 | |
| 11/29/73 | 560,000 lbs. | 0.05018 | 36,531 |
| 11/30/73 | 145,600 lbs. | 0.04893 | 7,124 |
| 12/14/73 | 280,000 lbs. | 0.04964 | 13,900 |
| 12/26/73 | 319,200 lbs. | 0.05536 | |
| 12/26/73 | 319,200 lbs. | 0.05661 | 35,740 |

On December 26, 1973, Trio-VR purchased from Master Feeders 12,596.16 bushels of corn at $2.70 per bushel or $34,009.63, all of which was on hand on December 31, 1973.

During 1973, Trio-VR purchased cattle as follows from Five Flags:

| Date | Number of head | Total cost |
|---|---|---|
| 1/04/73 | 141 | $39,663.82 |
| 2/07/73 | 125 | 42,336.40 |
| 2/13/73 | 140 | 49,450.97 |
| 2/19/73 | 145 | 51,486.46 |
| 2/19/73 | 177 | 64,767.01 |
| 2/23/73 | 139 | 43,365.09 |
| 3/06/73 | 163 | 63,285.32 |
| 3/07/73 | 3 | 1,184.71 |
| 3/12/73 | 165 | 64,303.92 |
| 3/13/73 | 145 | 49,324.23 |
| 3/19/73 | 143 | 57,523.19 |
| 3/19/73 | 155 | 47,210.26 |
| 3/23/73 | 149 | 58,064.01 |
| 3/26/73 | 165 | 45,656.36 |
| 3/27/73 | 102 | 38,005.41 |
| 5/11/73 | 164 | 61,102.28 |
| 8/20/73 | 167 | 82,317.43 |
| 8/23/73 | 143 | 69,895.53 |
| 8/27/73 | 154 | 65,229.98 |
| 8/27/73 | 152 | 75,348.13 |
| 8/28/73 | 156 | 63,965.07 |
| 9/17/73 | 158 | 48,199.34 |
| 9/19/73 | 175 | 78,577.50 |
| 10/01/73 | 175 | 58,148.90 |
| 10/02/73 | 152 | 59,158.85 |
| 10/02/73 | 121 | 51,466.68 |
| 10/05/73 | 165 | 65,281.00 |
| 10/05/73 | 34 | 14,794.75 |
| 11/09/73 | 55 | 20,161.32 |

During 1973, Trio-VR sold cattle as follows:

| Date | Number of head | Sales price |
|---|---|---|
| 2/14/73 | 1 | $179.14 |
| 3/14/73 | 1 | 1.98 |
| 4/11/73 | 1 | 4.30 |
| 4/20/73 | 1 | 35.49 |
| 4/20/73 | 1 | 123.69 |

| Date | Count | Amount |
|---|---|---|
| 4/25/73 | 1 | $208.29 |
| 5/03/73 | 146 | 77,067.19 |
| 5/14/73 | 1 | 300.65 |
| 5/17/73 | 1 | 201.00 |
| 6/06/73 | 1 | 263.06 |
| 6/06/73 | 113 | 63,970.90 |
| 6/06/73 | 1 | 177.06 |
| 6/29/73 | 1 | 204.15 |
| 7/07/73 | 134 | 69,710.07 |
| 7/11/73 | 2 | 864.00 |
| 7/26/73 | 29 | 16,797.69 |
| 7/31/73 | 10 | 5,457.75 |
| 8/02/73 | 1 | 372.30 |
| 8/02/73 | 1 | 124.74 |
| 8/02/73 | 1 | 315.69 |
| 8/03/73 | 1 | 452.88 |
| 8/04/73 | 129 | 70,401.65 |
| 8/05/73 | 1 | 531.08 |
| 8/06/73 | 123 | 65,358.60 |
| 8/15/73 | 3 | 1,862.52 |
| 8/16/73 | 155 | 96,254.50 |
| 8/16/73 | 175 | 112,139.28 |
| 8/16/73 | 10 | 6,771.31 |
| 8/18/73 | 130 | 84,812.35 |
| 8/19/73 | 1 | 601.15 |
| 8/29/73 | 65 | 30,074.50 |
| 8/29/73 | 40 | 17,910.35 |
| 8/30/73 | 60 | 26,827.70 |
| 8/31/73 | 24 | 11,337.50 |
| 9/05/73 | 43 | 21,288.88 |
| 9/12/73 | 84 | 42,117.50 |
| 9/12/73 | 2 | 1,025.00 |
| 9/21/73 | 136 | 77,204.54 |
| 9/23/73 | 1 | 593.02 |
| 9/23/73 | 163 | 96,720.96 |
| 9/26/73 | 147 | 81,693.57 |
| 9/30/73 | 98 | 45,488.10 |
| 10/02/73 | 1 | 371.33 |
| 10/10/73 | 141 | 68,782.85 |
| 10/11/73 | 1 | 150.43 |

| | | |
|---|---|---|
| 11/05/73 | 2 | $159.00 |
| 11/06/73 | 1 | 161.33 |
| 11/07/73 | 1 | 248.11 |
| 11/08/73 | 1 | 364.14 |
| 11/08/73 | 1 | 357.00 |
| 11/08/73 | 1 | 364.14 |
| 11/08/73 | 1 | 324.87 |
| 11/08/73 | 1 | 405.19 |
| 11/14/73 | 1 | 207.10 |
| 11/14/73 | 1 | 249.03 |
| 11/27/73 | 159 | 69,097.13 |

During 1974, Trio-VR purchased cattle as follows from Five Flags:

| Date | Number of head | Total cost |
|---|---|---|
| 1/07/74 | 66 | $23,654.18 |
| 1/08/74 | 84 | 33,500.65 |

During 1974, Trio-VR sold cattle as follows:

| Date | Number of head | Sales price |
|---|---|---|
| 1/21/74 | 1 | $150.85 |
| 1/18/74 | 143 | 78,182.78 |
| 1/29/74 | 150 | 93,362.50 |
| 2/11/74 | 1 | 349.00 |
| 2/11/74 | 5 | 1,224.54 |
| 2/19/74 | 1 | 264.32 |
| 2/20/74 | 1 | 129.58 |
| 2/20/74 | 1 | 170.45 |
| 2/23/74 | 1 | 221.40 |
| 2/24/74 | 145 | 56,654.40 |
| 2/25/74 | 1 | 553.50 |
| 2/25/74 | 66 | 36,914.40 |
| 2/26/74 | 97 | 53,885.70 |
| 2/26/74 | 38 | 18,217.35 |
| 3/03/74 | 40 | 18,593.10 |
| 3/05/74 | 154 | 81,783.90 |
| 3/10/74 | 68 | 32,575.05 |
| 3/14/74 | 153 | 70,418.00 |
| 3/15/74 | 171 | 86,671.66 |
| 3/29/74 | 55 | 26,416.93 |

| Date | | Quantity | | Amount |
|------|---|------|---|--------|
| 4/08/74 | ............................ | 1 | ..................... | $215.32 |
| 4/08/74 | ............................ | 1 | ..................... | 231.27 |
| 4/11/74 | ............................ | 1 | ..................... | 153.75 |
| 4/11/74 | ............................ | 151 | ..................... | 64,876.98 |
| 4/13/74 | ............................ | 14 | ..................... | 5,424.27 |
| 4/15/74 | ............................ | 45 | ..................... | 18,058.25 |
| 4/15/74 | ............................ | 163 | ..................... | 75,913.04 |
| 4/18/74 | ............................ | 4 | ..................... | 1,452.65 |
| 4/24/74 | ............................ | 1 | ..................... | 343.71. |
| 4/24/74 | ............................ | 106 | ..................... | 43,450.95 |
| 4/24/74 | ............................ | 2 | ..................... | 523.97 |
| 6/12/74 | ............................ | 1 | ..................... | 132.64 |
| 6/28/74 | ............................ | 70 | ..................... | 30,227.56 |
| 6/30/74 | ............................ | 72 | ..................... | 31,330.45 |

Trio-VR realized profits and suffered losses from its cattle-feeding operations as follows:

| Purchase date | | Profit | Loss |
|------|---|--------|------|
| 12/26/72 | ..................... | $15.45 | |
| 1/04/73 | ..................... | 62.99 | |
| 2/07/73 | ..................... | 55.10 | |
| 2/13/73 | ..................... | 57.53 | |
| 2/19/73 | ..................... | 107.46 | |
| 2/19/73 | ..................... | 56.72 | |
| 2/23/73 | ..................... | 71.29 | |
| 3/06/73 | ..................... | 67.19 | |
| 3/12/73 | ..................... | 36.50 | |
| 3/13/73 | ..................................................... | | $39.08 |
| 3/19/73 | ..................... | 51.65 | |
| 3/19/73 | ..................... | 95.21 | |
| 3/23/73 | ..................... | 2.45 | |
| 3/26/73 | ..................... | 53.92 | |
| 3/27/73 | ..................................................... | | 72.91 |
| 5/11/73 | ..................................................... | | 94.71 |
| 8/20/73 | ..................................................... | | 140.74 |
| 8/23/73 | ..................................................... | | 66.95 |
| 8/27/73 | ..................................................... | | 159.97 |
| 8/27/73 | ..................................................... | | 45.36 |

| | |
|---|---:|
| 8/28/73 ..................................................... | $129.26 |
| 9/17/73 ..................................................... | 69.82 |
| 9/19/73 ..................................................... | 133.26 |
| 10/01/73 ..................................................... | 108.36 |
| 10/02/73 ..................................................... | 140.59 |
| 10/02/73 ..................................................... | 66.07 |
| 10/05/73 ..................................................... | 126.99 |
| 11/09/73 ..................................................... | 92.90 |
| 1/07/74 ..................................................... | 180.73 |

During 1973, Trio-VR began to suffer losses and by June 30, 1974, it ceased doing business. It was dissolved on December 20, 1974.

Trio-VR is a partnership for income tax purposes. It maintained its books and records and filed its partnership returns under the cash method of accounting. Petitioners maintained their books and records and filed their income tax returns under the cash method of accounting.

Both Trio-VR and petitioners for the taxable years 1972, 1973, and 1974 were farmers and were engaged in farming for income tax purposes.

On its U.S. Partnership Return of Income (Form 1065) for the taxable year 1972, Trio-VR reported no income; it claimed a deduction for feed purchased of $360,400; and shares of its loss of $360,400 distributable $180,200 each to petitioner Kenneth H. Van Raden and petitioner Fred F. Van Raden.

On its U.S. Partnership Return of Income (Form 1065) for the taxable year 1973, Trio-VR reported gross income from the sales of cattle of $1,268,288, less costs of livestock of $833,402 and expenses of $435,823, or a net loss of $937, distributable equally to petitioners Kenneth H. Van Raden and Fred F. Van Raden.

On its U.S. Partnership Return of Income (Form 1065) for the taxable year 1974, Trio-VR reported gross income from the sales of cattle of $928,730.51, less costs of livestock of $810,757.86 and expenses of $53,262.11, or net income of $64,410.54 distributable equally to petitioners Kenneth H. Van Raden and Fred F. Van Raden.

On their income tax returns for the taxable year 1972, petitioners Kenneth H. Van Raden and Fred F. Van Raden each deducted his share of the Trio-VR loss for the taxable year 1972 in the amount of $180,200.

The Commissioner, in his statutory notices of deficiency, de-

termined that in computing the ordinary net income of Trio-VR for the taxable years 1972, 1973, and 1974, costs of cattle feed are allowable only during the taxable years in which the feed is consumed by the cattle rather than the taxable years in which payment is made for the feed. The Commissioner further determined that the allowable feed expense for the taxable year 1972 was zero rather than $360,400. Correspondingly, the Commissioner determined that the allowable feed expense for the taxable year 1973 was $530,543.94, rather than $334,233 as claimed on the returns, and the allowable feed expense for the taxable year 1974 was $165,171.92, rather than $1,082.86 as claimed on the return.

## ULTIMATE FINDING OF FACT

The purchase of feed by Trio-VR on December 26, 1972, was for a valid business purpose. The use of the cash receipts and disbursements method of accounting in maintaining books and records and filing returns for Trio-VR and petitioners clearly reflected their income for the taxable year 1972.

## OPINION

The sole issue to be decided stems from petitioners' distributive shares as limited partners of a partnership (Trio-VR) engaged in the cattle-feeding business in Guymon, Okla. Trio-VR reported a net operating loss for its initial taxable year from December 26, 1972, to December 31, 1972. For that period, it neither earned nor reported gross income. The net operating loss was generated solely from feed purchased and paid for in the first taxable year in the amount of $360,400. Trio-VR maintains its books and records and files its partnership returns on the cash method of accounting on a calendar year basis. Petitioners also utilize the cash method of accounting and file their income tax returns on a cash basis calendar year.

In July 1972, the Kenneth Van Radens and the Fred Van Radens each realized long-term capital gains in excess of $2 million from the sale of corporate stock.

The Commissioner, in his statutory notices of deficiency to petitioners, disallowed the feed expense of Trio-VR in full which eliminated the net operating loss and the partners' distributive shares of the losses. He also adjusted the feed expense deductions of Trio-VR claimed in the taxable years 1973 and 1974 but

the adjustments resulted in overassessments over which we have no jurisdiction.

The Commissioner's disallowance of the deduction claimed for feed purchased is based upon Rev. Rul. 75–152, 1975–1 C.B. 144. Petitioners rightly contend and respondent does not disagree that a revenue ruling is not the force of law. Respondent's position in this case is consistent with the revenue ruling and for convenience the issue will be analyzed in the manner set forth in the ruling.

Respondent's position is that farmers reporting on the cash method of accounting may deduct as ordinary and necessary business expenses under section 162,[1] I.R.C. 1954, feed to be consumed by their livestock in the taxable year of payment only if all of the following three tests are satisfied:

(1) The expenditure for the feed must be a payment, not merely a deposit;

(2) The prepayment must be for a business purpose and not merely for tax avoidance; and

(3) The deduction of such costs in the taxable year of payment must not result in a material distortion of income.

The parties agree that both Trio-VR and petitioners qualify for tax treatment as farmers, the feed purchased in December 1972 was to be used and was used for feeding the livestock of Trio-VR which was the trade or business of Trio-VR, and none of it was consumed by the livestock in 1972.

### Payment vs. Deposit

The first test is that the expenditure for the purchase of feed must be a payment and not a mere deposit. The parties agree that Trio-VR satisfied this test; the expenditure was a payment and not a mere deposit.

### Business Purpose vs. Tax Avoidance

The second test is disputed; whether the prepayment was for a business purpose and not merely for tax avoidance. The parties agree that feed expense is an ordinary and necessary business expense of Trio-VR. The test of business purpose versus tax avoidance goes to the *timing* of the deduction.

---

[1] All section references are to the Internal Revenue Code of 1954, as amended.

The substantial purchase of feed within the 6-day initial taxable year of the partnership naturally raises a question as to the business purpose of the purchase *at that time.*

Petitioners do not challenge the applicability of the business purpose test; instead, they contend that they have satisfied the test. We, therefore, need not decide whether a business purpose must exist for the *timing* of an ordinary and necessary business expense because it is not raised as an issue here. *Clement v. United States,* 217 Ct. Cl.  , 580 F.2d 422, 427 (1978), cert. denied 440 U.S.  (1979).

Assuming, therefore, that petitioners must prove a business purpose for the purchase of feed in December 1972, instead of some other month, we must look at all of the facts and circumstances because business purpose is a question of fact. *Welch v. Helvering,* 290 U.S. 111 (1933); *Wilson v. Commissioner,* 353 F.2d 184 (9th Cir. 1965), revg. 42 T.C. 914 (1964).[2]

To prove business purpose, petitioners rely on the testimony of Mr. Hitch, who was the manager of the cattle feeding operations, and upon statistics of corn prices in Chicago, Ill., and Kansas City, Mo. Mr. Hitch testified that the price of feed in the Guymon, Okla., area located in the "Oklahoma Panhandle" varied directly with the feed prices in Chicago and Kansas City. Petitioners offered no statistics of feed prices in Guymon but did offer proof of corn prices in Chicago and Kansas City for various years and also graphs depicting cash corn prices for 5-, 10-, and 15-year periods all ending in 1975.

Mr. Hitch testified that the price of feed was lowest after harvest in the autumn months and then rose steadily until harvest the following year except for a slight decline after the first of the calendar year when farmers sold grain to raise money for payment of Christmas expenses, taxes, and other expenses incurred the previous December.

He testified further that the feed was purchased in December because the price was lowest at that point and by purchasing a year's supply of feed in advance the feed price was fixed. Petitioners argue that Mr. Hitch's testimony is corroborated by the price statistics and graphs.

We are not concerned with the fluctuations of feed prices

---

[2] *Frazier v. Commissioner,* T.C. Memo. 1975–220.

after December 1972 because Mr. Hitch's experience, which formed the basis for his decision to purchase the feed in December 1972, had to occur prior to December 1972. All of the graphs are based upon prices through 1975; therefore, they do not tend to corroborate Mr. Hitch's testimony as to his reasons in December 1972. The corroboration of Mr. Hitch's testimony, therefore, rests upon the cash prices of No. 2 yellow corn in Chicago and Kansas City for the years that such prices were stipulated, up to 1972.

In deciding whether Mr. Hitch's testimony is supported, the prices in January and February are most critical because Trio-VR would need to purchase feed in those months if it had not done so in December. We have analyzed the cash prices for the Kansas City market for the period from 1955 through 1971. In comparing the December prices only to the succeeding months of January and February, we find that out of the 17 years, in 9 years the prices in December were the lowest of the 3 months; in 4 years the January prices were lower than the December prices; in 5 years the February prices were lower than the December prices; in 2 years the January prices were equal to the December prices; and in 2 years the February prices were equal to the December prices. The net result of such analysis is that out of the 34 months of January and February, in 9 months the prices were lower, and in 4, the prices were equal to the December prices. In the remaining 21 months of January and February, the prices were higher than in the previous December.

The relevant prices for the Chicago market embrace 1965 through 1971. In comparing the December prices only to the succeeding months of January and February, we find that out of the 7 years, in 3 years the December prices were lowest; in 3 years the January prices were lower than the December prices; in 2 years the February prices were lower than the December prices; and in 1 year the February prices were equal to the December prices. The net result of such analysis is that out of the 14 months of January and February, the prices were lower in 5 and equal in 1 to the December prices. In the remaining 8 months the prices in December were lower than the prices in the succeeding months of January and February.

The year 1966 appeared to be unusual because it was the only year in which prices in both Chicago and Kansas City declined for every month after December. If 1966 is eliminated, the Kan-

sas City statistics would reflect only 7 months of lower prices in January and February and 4 months of equal prices out of the 34 months involved. If the year 1966 were eliminated from the Chicago statistics, only 3 years of lower prices would remain in January and February and 1 year of equal prices out of the 14 months involved.

Based upon the foregoing, we hold that Mr. Hitch's testimony is sufficiently corroborated by the statistics of No. 2 yellow corn prices on the Chicago and Kansas City markets. Respondent offered no evidence to contradict Mr. Hitch's testimony or the statistics. The evidence, therefore, establishes a business purpose for the purchase of feed in December instead of succeeding months.

In addition, Mr. Hitch testified that he applied his longtime experience in cattle-feeding operations to Trio-VR by trying to buy feed in the fall months and also trying to buy a year's supply of feed at that time. The amount of feed purchased was based upon the number of cattle to be fed in the coming 12 months, not the income tax deduction to be generated by the purchase. We believed the testimony of Mr. Hitch when he so testified and when he said that the amount of the deduction was based upon the price of the feed purchased, not the amount of feed purchased. Out of the feed purchased, 91.11 percent of the silage was consumed in 1973 and 98.31 percent of the corn was consumed in 1973. Respondent offered no evidence to controvert the testimony of Mr. Hitch. We are, therefore, bound to accept his testimony as true because it is competent, relevant, credible, and uncontradicted. *Banks v. Commissioner*, 322 F.2d 530, 537 (8th Cir. 1963).

There is some overlapping of the business purpose test and the distortion of income test which we will explain further in discussing the latter test (No. 3). Respondent points to the mismatching of income and expense in his argument on the distortion of income test. We believe that argument should also be analyzed under the business purpose test. It is common knowledge that any new business incurs and pays expenses which bear little relationship to the first income generated. These "startup" expenses support the ancient proverb that you must spend mon-

ey if you wish to make money.[3] Had petitioners invested in Trio-VR in January of 1973, respondent very likely would not have challenged a deduction for feed purchased in that month. There is probably no rule of thumb as to which month between January and December in the taxable year of a limited partnership filing on a calendar year cash basis that a year's purchase of grain would arouse the curiosity of the Internal Revenue Service. The fact that here the petitioners invested in Trio-VR in December is not as sinister as respondent argues. Petitioners did not sell their stock in Peerless Trailer & Truck Services, Inc., until July 1972. It is true that the sale created the long-term capital gain which was offset by the partnership loss but it also created the wherewithal to make sizeable investments. The parties stipulated that petitioners discussed investing in the cattle-feeding program in the fall of 1972. The subscription agreements are dated December 18, 1972. In December 1972, Trio-VR not only purchased feed, which it deducted; it also purchased 149 head of cattle at a cost of $56,672.76 which, of course, is not deductible. Mr. Hitch purchased the feed at the earliest time he had the money available. Had petitioners invested earlier, Mr. Hitch would likely have purchased the feed earlier in the autumn at a lower price as he customarily did and as he did in 1973. Petitioners knew they were liable for a large tax on the captial gain in July unless they had offsetting deductions. This situation is not the typical "yearend" tax planning. Had petitioners been made aware of the investment possibility shortly after their sale of stock in July or had they acted more promptly after first investigating the investment in cattle-feeding operations, the feed and cattle could have been purchased in the autumn of 1972 when feed prices were lower than they were in December. See *Lyon Co. v. United States*, 435 U.S. 561, 580 (1978), wherein the Court stated: "The fact that favorable tax consequences were taken into account by Lyon [the taxpayer] on entering into the transaction is no reason for disallowing those consequences.[15] We cannot ignore the reality that the tax laws affect the shape of nearly every business transaction." (Fn. omitted.)

Given the fact of the time Mr. Hitch first had the money available to purchase the feed, his experience, and practice of

---

[3]Plautus, *Asinaria*, Act I, line 217 (c. 200 B.C.).

purchasing a year's supply in advance based upon the number of head of cattle he intended to feed, we conclude that the purchase of feed was appropriate and helpful to the business of Trio-VR and we are loath to override Mr. Hitch's judgment. *Cravens v. Commissioner*, 272 F.2d 895 (10th Cir. 1959), revg. 30 T.C. 903 (1958). The businessman is allowed to make business judgments. *Clement v. United States*, 217 Ct. Cl.     , 580 F.2d 422, 427 (1978), cert. denied 440 U.S.     (1979).

Respondent's Rev. Rul. 75–152 cites as some examples of business purpose the following: fixing maximum prices and securing an assured feed supply. Notwithstanding all of respondent's arguments to the contrary, we conclude that petitioners have proved that the primary or dominant purpose of the feed purchase in December 1972 was a business purpose instead of tax avoidance and they have satisfied the requirements of test No. 2.

## Distortion of Income

The third test which respondent contends petitioners must satisfy is commonly referred to as the distortion of income test. It is based upon section 446(b) of the Code which provides:

(b) EXCEPTIONS.—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income.

Petitioners and the partnership maintained their books and records and filed their returns on the cash receipts and disbursements method of accounting. The Commissioner determined that such accounting method did not clearly reflect income as to the purchases of feed in December 1972 and 1973 and the partnership should, instead, account for and report for tax purposes the feed as it is consumed. Section 446(b) is an exception to section 446(a) which provides that taxable income shall be computed under the method of accounting on the basis which the taxpayer regularly computes his income in keeping his books.

Section 461 of the Code provides that deductions shall be taken by the taxpayer in the taxable year that is proper under the method of accounting used in computing taxable income.

Section 471 provides that whenever, in the opinion of the Secretary, the use of inventories is necessary to clearly reflect income, the taxpayer shall take inventories on such basis as the

Secretary may prescribe, conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflects the income.

Section 1.471–6(a), Income Tax Regs., provides as follows:

Inventories of livestock raisers and other farmers.

(a) A farmer may make his return upon an inventory method instead of the cash receipts and disbursements method. It is optional with the taxpayer which of these methods of accounting is used but, having elected one method, the option so exercised will be binding upon the taxpayer for the year for which the option is exercised and for subsequent years unless another method is authorized by the Commissioner as provided in paragraph (e) of section 1.446–1.

Section 1.162–12(a), Income Tax Regs., provides in part, "The purchase of feed and other costs connected with raising livestock may be treated as expense deductions insofar as such costs represent actual outlay."

Notwithstanding the unequivocal language of the regulations, respondent contends that allowing a farmer to use the cash method of accounting nevertheless subjects him to the test of section 446(b); i.e., that it must clearly reflect income. Petitioners, on the other hand, argue that the Commissioner is precluded from applying section 446(b) because to do so would conflict with section 461 which allows a deduction to be taken in the taxable year under the taxpayer's method of accounting and farmers are granted the option to use the cash method or the inventory method of accounting. Petitioners reason, therefore, that the Commissioner cannot use section 446(b) to force a farmer to use the inventory method of accounting for feed purchased for livestock consumption.

We disagree with petitioners. Although the Commissioner is bound by his regulations, we do not agree that a regulation, although admittedly unqualified and unambiguous, can prohibit the Commissioner from carrying out his responsibility imposed by a discretionary code section which has such broad scope as section 446(b). Even if the regulation rises to the dignity of the effect of law as pointed out in *Helvering v. Winmill*, 305 U.S. 79, 82 (1938), we conclude that section 446(b) is available to the Commissioner.

Section 446(b) has been applied to prepaid interest. The deduction for interest allowable by section 163 of the Code carries with it no requirement of business purpose or the need for a regula-

tion to make it available as a deduction to cash basis taxpayers in every line of endeavor. And yet, section 446(b) has been applied to the *timing* of interest deductions; e.g., *Sandor v. Commissioner*, 62 T.C. 469 (1974), affd. 536 F.2d 874 (9th Cir. 1976); *Resnik v. Commissioner*, 66 T.C. 74 (1976), affd. 555 F.2d 634 (7th Cir. 1977).

An appeal in the instant case will lie in the United States Court of Appeals for the Ninth Circuit. That court affirmed our decision in *Sandor*, clearly approving our holding that the Commissioner possessed the authority to disallow the interest deduction under section 446(b). It would be redundant to repeat here the reasoning for our holding in *Sandor* but we hold that the reasoning applies with equal force to the instant case. Nothing in the case law cited by petitioners convinces us that section 446(b) cannot be used by the Commissioner to prevent abuses by farmers who report on the cash method of accounting. Accord, *Clement v. United States*, 217 Ct. Cl. , 580 F.2d 422, 427 (1978), cert. denied 440 U.S. (1979).

The next question posed is whether section 446(b) should be applied at the partnership level or the partner level. Petitioners argue for the partner level; respondent argues for the partnership level, relying on our decision in *Resnik v. Commissioner, supra*. Petitioners contend that *Resnik* should have been decided on a business purpose test instead of section 446(b) because *Sandor* was based upon the absence of business purpose. We disagree. *Sandor* quite clearly is based upon the discretion accorded the Commissioner by section 446(b) and we reaffirm our decisions in both *Sandor* and *Resnik*. *Cole v. Commissioner*, 586 F.2d 747 (1978), affg. 64 T.C. 1091 (1975). For the reasons we expressed in *Resnik*, we hold that section 446(b) applies to prepaid feed expenses at the partnership level. Although the parties stipulated that petitioners were farmers, their income tax returns reflect farm income primarily from Trio-VR with small losses from another source on Schedule F. From this we conclude that the parties stipulated petitioners to be farmers by reason of their limited partnership interests in Trio-VR. Accordingly, it is appropriate to apply the distortion of income test to the enterprise which allows optional accounting methods to the partnership; i.e., the farming operation.[4] In reaffirming *Sandor*, how-

---

[4]At trial respondent contended that the distortion of income test should be applied at the partner-

ever, we do not imply that business purpose is not involved as we will explain further.

Having concluded that section 446(b) is applicable to the Trio-VR partnership purchase of feed in December 1972, we must decide whether the Commissioner abused his discretion in his determination that the partnership must use an inventory method of accounting for the feed in order to clearly reflect income. Whether an accounting method materially distorts income is a question of fact. *Resnik v. Commissioner*, 555 F.2d at 636; *Sandor v. Commissioner*, 62 T.C. at 484, 536 F.2d at 875.

The cash method of accounting will usually result in some distortion of income because the benefits derived from payments for expenses or materials extend to varying degrees into more than one annual accounting period. If the cash method is consistently utilized and no attempt is made to unreasonably prepay expenses or purchase supplies in advance, the distortion is not material and over a period of years the distortions will tend to cancel out each other. The Court of Appeals for the Ninth Circuit observed this concept when it made the following observation in *Spitalny v. United States*, 430 F.2d 195, 197 (9th Cir. 1970), which involved feed purchased and sold within 1 taxable year: "The expense deduction as permitted by regulation [sec. 1.162–12, Income Tax Regs.] is intended to reflect the cost of feed *actually* consumed during the taxable year and to accomplish *over a period of years* roughly the same result as would have been had through use of the inventory method, but by a simpler form of accounting." (Emphasis added.)

In the instant case, Trio-VR purchased feed in the fall months in both 1972 and 1973. The consistent practice of Mr. Hitch was to make such purchases in those months. Because of unforeseen losses, the cattle-feeding operation was terminated in 1974. We believe, however, that had Trio-VR continued to operate, it would have purchased a year's supply of feed in the fall months of each year when feed was least expensive. If an accounting method is in accord with generally accepted accounting princi-

ship level and the partner level. On brief, however, he pressed for application at the partnership level; conceding, however, that it should at least first be applied at the partnership level. Respondent advances no argument on brief for application of the test at the partner level. In view of respondent's position and our holding against petitioners as to the level for examination, we decline to examine the distortion of income test at the partner level.

ples and is consistently used, then it will be regarded as clearly reflecting income for tax purposes, *Sam W. Emerson Co. v. Commissioner*, 37 T.C. 1063, 1067 (1962); *Auburn Packing Co. v. Commissioner*, 60 T.C. 794, 799 (1973), unless the generally accepted accounting principle conflicts with the tax regulations. *Thor Power Tool Co. v. Commissioner*, 439 U.S.     (1979). Here, the cash method of accounting without the use of inventories for farmers was countenanced by the income tax regulations. Respondent does not contend that his own regulations prescribed an optional accounting system that does not clearly reflect income.

Accounting methods and the nature of the business are inextricable. "A method of accounting which reflects the consistent application of generally accepted accounting principles *in a particular trade or business* in accordance with *accepted conditions or practices in that trade or business* will ordinarily be regarded as clearly reflecting income, provided all items of gross income and expense are treated consistently from year to year." Sec. 1.446–1(a)(2), Income Tax Regs. (Emphasis added.) Examples of accounting methods which are dictated by the particular trade or business include those where the production, purchase, or sale of merchandise is an income-producing factor, sec. 1.446–1(a)(4)(i), Income Tax Regs.; a taxpayer whose sole source of income is wages need not keep formal books in order to have an accounting method, sec. 1.446–1(b)(2), Income Tax Regs.; crop method of accounting for farmers, sec. 1.446–1(c)(1)(iii), Income Tax Regs.; if the taxpayer is engaged in more than one trade or business, a different method of accounting may be used for each trade or business if it clearly reflects income, sec. 1.446–1(d)(1), Income tax Regs.; income from long-term contracts may be included under either the percentage of completion method or the completed contract method, sec. 1.451–3(a), Income Tax Regs.; dealers in personal property who regularly sell on the installment plan may report on the installment method of accounting, sec. 1.453–1(a), Income Tax Regs.

Because the method of accounting and the nature of the trade or business are so interdependent, we conclude that the distortion of income must not be examined in a vacuum but in light of the business practice or business activities which give rise to the transaction which the Commissioner has determined must be accorded a different accounting treatment. For example, mate-

rial distortions of income may occur if the sales force of a business is more successful in December than in January, yet such a distortion would not require adjustment to clearly reflect income because the distortion resulted from the business activity itself. Should the result be different if the taxpayer purchases a year's supply of its primary cost item at its lowest cost consistently from year to year? We do not think so. In short, a substantial legitimate business purpose satisfies the distortion of income test. We recognized this implicitly in *Sandor v. Commissioner, supra.* See *Stokes v. Commissioner,* 22 T.C. 415 (1954); *Maple Leaf Farms, Inc. v. Commissioner,* 64 T.C. 438 (1975); *Hi-Plains Enterprises, Inc. v. Commissioner,* 60 T.C. 158 (1973), affd. 496 F.2d 520 (10th Cir. 1974).

Even in the instance of the accumulated earnings tax (a penalty tax) where an inquiry is made into the reasonable needs of the business, we have recognized as reasonable, accumulations to carry the business through perils of that business occasioned by the weather.[5]

The business of farming has long been recognized as hazardous due to the effects of weather. That condition and the seasonal nature of farming bring about the cyclical nature of feed prices upon which the success of Trio-VR greatly depended. Farmers have historically been accorded special treatment because of the nature of the business. In commenting upon the long-standing rule that a farmer may use the cash method of accounting, the Supreme Court stated in *Catto v. United States,* 384 U.S. 102, 116 (1966): "The sacrifice in accounting accuracy under the cash method represents an historical concession by the Secretary and the Commissioner to provide a unitary and expedient bookkeeping system for farmers and ranchers in need of a simplified accounting procedure."

After some discussion of section 207 of the Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1536, 26 U.S.C. sec. 464, the parties agree that it does not apply retroactively to the instant case and nothing in the legislative history demonstrates congressional intent applicable to the taxable years before us. Cf. *Sandor v. Commissioner,* 62 T.C. at 479.

The Court of Claims recently held that prepaid feed expense

---

[5]*Millane Nurseries & Tree Experts, Inc. v. Commissioner,* a Memorandum Opinion of this Court dated Dec. 15, 1942, docket No. 110443; *Road Materials, Inc. v. Commissioner,* T.C. Memo. 1967–187.

resulted in a material distortion of income but disallowance of the deduction did not impose the requirements of keeping inventories on the taxpayer because of section 1.461–1(a)(1), Income Tax Regs. *Clement v. United States, supra.* Section 461 of the Code, under which the regulation was promulgated, provides that a deduction or credit shall be taken in the taxable year which is the proper taxable year under the taxpayer's method of accounting. Because the partnership was on the cash receipts and disbursements method of accounting, the "proper taxable year" for claiming a deduction for feed purchased was 1972 when the partnership paid for the feed. This conclusion is supported by section 1.162–12(a), Income Tax Regs., which provides in part "The purchase of feed and other costs connected with raising livestock may be treated as expense deductions insofar as such costs represent actual outlays."

Section 1.461–1(a)(1), Income Tax Regs., bears the following caveat upon which the Court of Claims bases its opinion: "If an expenditure results in the creation of an asset having a useful life which extends substantially beyond the close of the taxable year, such an expenditure may not be deductible, or may be deductible only in part, for the taxable year in which made." The regulations then illustrate by the example of a lessee who makes capital improvements to a leasehold which should be amortized over the remaining period of the lease.

Respondent relies upon cases in which certain costs were required to be prorated over more than one annual accounting period to urge here the application of section 1.461–1(a)(1), Income Tax Regs. Those cases involved prepaid insurance premiums, *Commissioner v. Boylston Market Ass'n,* 131 F.2d 966 (1st Cir. 1942); prepaid rent, *Smith v. Commissioner,* 51 T.C. 429 (1968); advance payment of delay rental on an oil and gas lease, *Williamson v. Commissioner,* 37 T.C. 941 (1962); and loan costs, *Lovejoy v. Commissioner,* 18 B.T.A. 1179 (1930). Those cases all involved "period costs" which are costs that arise with respect to time intervals rather than the creation of products or rendition of services. "Period costs" differ from "product costs," the latter which vary with the magnitude of the production process, as we have here. "Period costs" are more akin to overhead costs which are ongoing regardless of the magnitude of the business. Feed purchased cannot fit into this category because its consumption does not rest upon the mere passage of time but, instead, upon

the magnitude of the production process. Feed is the most essential ingredient to the business of the partnership; i.e., fattening the cattle. Exhaustion of that asset varies directly with the magnitude of that process by the number of cattle and the rate of consumption.

"Period costs" are easily allocable to more than one accounting period by dividing the total cost by the number of months over which its useful life extends. This ease of allocation was recognized in *Commissioner v. Boylston Market Ass'n, supra.* "Product costs," such as cattle feed, do not lend themselves to such ease of allocation. They must be specifically accounted for because the rate of consumption does not rest solely upon the passage of time. To require allocation would mean that the farmer must either inventory the feed at the end of each annual accounting period or he must maintain accurate records of consumption of the feed. Consumption records are nothing more than a backhanded inventory method and probably involve a more onerous chore. To impose upon the farmer the duty to maintain consumption records or to inventory the feed is contrary to the historical concession to farmers of not requiring inventories allowed by the Commissioner in his own regulations. *Catto v. United States,* 384 U.S. 102 (1966). In the instant case, the partnership maintained consumption records for its own business purposes and respondent apparently relied upon them in adjusting the feed expense deduction to the feed consumed. *Requiring* such records would be contrary to the regulations and *Catto v. United States, supra.* Financial accounting under generally accepted accounting principles and accounting required by tax regulations do not necessarily coincide. *Thor Power Tool Co. v. Commissioner, supra.* We do not agree, therefore, that the Commissioner has not attempted to put the partnership on the inventory method of accounting.

Based upon the foregoing, we hold that the Commissioner

abused his discretion under section 446(b), *in this case*, by disallowing the deduction for feed purchased in December 1972.

> *Decision will be entered for the petitioners in docket No. 1336–76.*

> *Decision will be entered under Rule 155 in docket No. 1407–76.*

Reviewed by the Court.

TANNENWALD, *J.*, concurring: To me there is a straightforward answer to the issue of deductibility of prepaid feed expenses and it is rooted in the historical treatment accorded farmers. See *United States v. Catto*, 384 U.S. 102, 116 (1966); *Maple Leaf Farms, Inc. v. Commissioner*, 64 T.C. 438, 447 (1975). Such being the situation, I think the issue is sui generis and that cases involving the proration of other prepaid expenses are beside the point.

For a long time, the respondent has sought to persuade the courts to extricate him from the box in which he finds himself as to his ability to modify the option he has given to farmers to choose between the cash or accrual basis of accounting. Sec. 1.471–6(a), Income Tax Regs. Initially, his attack focused primarily upon the question of whether the amount sought to be deducted was a true prepayment or merely a deposit. See *Owens v. Commissioner*, 568 F.2d 1233, 1243–1246 (6th Cir. 1977), revg. as to this issue 64 T.C. 1, 16–19 (1975); *Lillie v. Commissioner*, 45 T.C. 54 (1965), affd. per curiam 370 F.2d 562 (9th Cir. 1966). In this focus, he met with varying degrees of success. See L. Ward, "Tax Postponement and the Cash Method Farmer: An Analysis of Revenue Ruling 75–152," 53 Texas L. Rev. 1119, 1123–1145 (1975).

A second line of attack by respondent involved his attempt to apply the requirement of section 446(b) (or its predecessor, section 41 of the Internal Revenue Code of 1939) that a taxpayer's methods of accounting clearly reflect income. Until the decision of the Court of Claims in *Clement v. United States*, 217 Ct. Cl. , 580 F.2d 422 (1978), that approach was also generally unsuccessful. See *Owens v. Commissioner, supra* at 1245–1246; *Cravens v. Commissioner*, 272 F.2d 895 (10th Cir. 1959), revg. on other

grounds 30 T.C. 903 (1958). Cf. *Ernst v. Commissioner*, 32 T.C. 181, 186–187 (1959). And even the *Clement* case found it necessary to buttress the application of section 446(b) by relying ultimately on section 1.461–1(a)(1), Income Tax Regs.

Respondent's latest attack is represented by Rev. Rul. 75–152, 1975–1 C.B. 144, in which he lays down the three-pronged test outlined in the majority opinion and buttresses his distortion-of-income position under section 446(b) by reference to section 461 and section 1.461–1(a)(1), Income Tax Regs. The Court of Claims upheld the applicability of section 461 and section 1.461–1(a)(1), Income Tax Regs., in *Clement v. United States, supra.*

In my opinion, section 461 and section 1.461–1(a)(1), Income Tax Regs., simply do not apply. Section 461 (except for specific provisions not applicable herein) merely states: "The amount of any deduction or credit allowed by this subtitle shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income."

Clearly, a farmer is entitled to use the cash basis "method of accounting" and is not required to use inventories. It is his option as to which method he uses. Sec. 1.471–6(a), Income Tax Regs.[1] Respondent seeks to avoid the effect of this dispensation by relying on the portion of section 1.461–1(a)(1), Income Tax Regs., which provides: "If an expenditure results in the creation of an asset having a useful life which extends substantially beyond the close of the taxable year, such an expenditure may not be deductible, or may be deductible only in part, for the taxable year in which made." That sentence is preceded by provisions dealing with depreciation, depletion, and losses, i.e., noncash items, and followed by an example of leasehold improvements. In short, the regulation was intended to deal with assets which have an inherently declining value with the passage of time, i.e., items which have traditionally been considered capital in nature, and perhaps additionally with assets whose cost was inherently keyed to more than one taxable period, e.g., rent, interest, etc. Feed simply does not fall within such categories.

There is no escape from the fact that feed is an element of cost of goods sold where cattle is inventoried. Even though respondent is not requiring the partnership herein to inventory cattle,

---

[1] See also sec. 1.162–12(a), Income Tax Regs.

he is in effect requiring it to distill out an inventory cost and treat it as an inventoriable item. This, in my opinion, he should not be permitted to do in the case of a farmer. To characterize feed expenditures as "period costs," as the Court of Claims does in *Clement v. United States, supra,* so as to avoid the inventory categorization of feed expense and bring such a prepaid item within the ambit of section 1.461–1(a)(1), Income Tax Regs., is sheer semantic legerdemain. "A rose is a rose, is a rose, is a rose." See G. Stein, Geography and Plays: Sacred Emily, p. 187 (1922). The fact of the matter is that respondent's action amounts to nothing more than requiring the partnership to inventory its feed separate and apart from its cash basis treatment of the cattle itself, i.e., to take away from a farmer a portion of his option not to compute his income under an inventory method, section 1.471–6(a), Income Tax Regs., to the contrary notwithstanding.

Unquestionably, the special privilege accorded to farmers has its limits (see *Zaninovich v. Commissioner,* 69 T.C. 605, 608 (1978)), but those limits do not apply to the instant situation. In short, I disagree with the Court of Claims' approach reflected in *Clement.* I think that respondent's historical concession, giving a farmer the right to choose between a cash expenditures and inventory method of accounting in respect of items which would normally be part of the cost of goods sold, i.e., inventoriable, amounts to his agreement that the "clearly reflect income" requirement of section 446(b) is deemed to have been satisfied. Cf. *Fribourg Navigation Co. v. Commissioner,* 383 U.S. 272 (1966). If respondent is dissatisfied with this result, his course of action is to persuade the legislature to open up a path from the corner into which he has historically painted himself. He should not expect the courts to do it for him. In this connection, I note that, for whatever his reasons, respondent limited his attack on the problem in connection with sections 278(b) and 464 (enacted by the Revenue Act of 1976) to deductions of feed expenses by "farming syndicates" and not farmers generally. See *Fribourg Navigation Co. v. Commissioner, supra* at 284.

I note also that the conclusion in the majority opinion that the partnership had a valid business purpose in purchasing a 12-months' supply of feed in advance is not entirely free from doubt. However, I am satisfied that there was a sufficient basis for a finding of business purpose, in respect of the instant pur-

chase, to satisfy that condition of Rev. Rul. 75–152, *supra,* and to provide the required economic substance for the transaction. Under these circumstances, I think the principle that a taxpayer has the right to engage in a transaction that has substance beyond its tax benefits, even though his motivation may have been to obtain a deduction to offset taxable income, is applicable. See *McLane, Jr. v. Commissioner,* 46 T.C. 140 (1966), affd. per curiam 377 F.2d 557 (9th Cir. 1967), wherein we stated (at page 145):

The building may not be constructed entirely from tax advantage, but, if the foundations and bricks have economic substance, the economic or financial inducement of the tax advantage can provide the mortar. *Hanover Bank v. Commissioner,* 369 U.S. 672, 682 (1962). [Fn. ref. omitted.][2]

Additionally, I am constrained to mention that it is arguable whether the issue of business purpose is an appropriate consideration in determining the treatment of prepaid feed expenses. See L. Ward, *supra,* 53 Texas L. Rev. at 1172–1173, 1178. I recognize, however, that the parties in this case are in agreement that this element of Rev. Rul. 75–152, *supra,* should be placed in issue and that the question of business purpose has been dealt with in some of the decided cases involving the deduction of prepaid feed expenses. See L. Ward, *supra,* 53 Texas L. Rev. at 1174–1177.

Finally, I see no need to go beyond my conclusion that the partnership was entitled to deduct the prepaid feed expenditures in question in the year of payment and analyze whether there was a distortion of income at the partner level. See *Resnik v. Commissioner,* 66 T.C. 74, 82 (1976), affd. per curiam 555 F.2d 634, 636 (7th Cir. 1977). As the majority points out (note 4), the respondent did not press this issue. Beyond this, I do not believe that examination of the distortion-of-income point, at the partner level, would be appropriate. Once it is determined that the partnership had a sufficient business reason for expending the sums in question, the fact that the individual partners got a tax benefit from the loss is beside the point.

DAWSON, IRWIN, STERRETT, and HALL, *JJ.,* agree with this concurring opinion.

---

[2]Compare *Ginsburg v. Commissioner,* T.C. Memo. 1976–199.

WILBUR, *J.*, dissenting: I respectfully dissent. Section 446(b) provides:

SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING.

(b) EXCEPTIONS.—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income.

In *Sandor v. Commissioner*, 62 T.C. 469 (1974), affd. 536 F.2d 874 (9th Cir. 1976), we restated the hornbook law governing the Commissioner's authority to change a taxpayer's method of accounting in order to clearly reflect income:

The Commissioner has broad powers and discretion to determine whether accounting methods employed by a taxpayer clearly reflect income. *Commissioner v. Hansen*, 360 U.S. 446 (1959); *Fort Howard Paper Co.*, 49 T.C. 275 (1967); *Photo-Sonics, Inc.*, 42 T.C. 926 (1964), affd. 357 F.2d 656 (C.A. 9, 1966). Courts will not overturn the Commissioner's determination unless the evidence clearly shows that he abused his discretion. *Schram v. United States*, 118 F.2d 541 (C.A. 6, 1941); *Michael Drazen*, 34 T.C. 1070 (1960). The taxpayer has a heavy burden of proof in establishing that the Commissioner abused his discretion. *Fort Howard Paper Co., supra; Photo-Sonics, Inc., supra*. Even if an accounting method may be in accord with generally accepted accounting principles, it may not clearly reflect income and, therefore, may not be binding upon the Commissioner. *American Automobile Assn. v. United States*, 367 U.S. 687 (1961); *Fort Howard Paper Co., supra*. [62 T.C. at 476–477.]

In *Sandor*, we held that the Commissioner's power to change a taxpayer's method of accounting may be exercised with respect to a material item (i.e., prepaid interest, the item involved in *Sandor*), if this is necessary to clearly reflect income. *Sandor* has been followed consistently by this Court and other courts. *Burck v. Commissioner*, 63 T.C. 556 (1975), affd. 533 F.2d 768 (2d Cir. 1976); *Cole v. Commissioner*, 64 T.C. 1091 (1975), affd. 586 F.2d 747 (9th Cir. 1978); *Resnik v. Commissioner*, 66 T.C. 74 (1976), affd. 555 F.2d 634 (7th Cir. 1977); *Anderson v. Commissioner*, 568 F.2d 386 (5th Cir. 1978), affg. a Memorandum Opinion of this Court.

Section 446(b) is concerned with accounting methods clearly reflecting income and is applicable to prepaid feed expenses as well as prepaid interest. If the method of handling a substantial prepaid item results in a material distortion of income, the Commissioner has been given the authority to change the taxpayer's method of accounting for that item, whether the item is a prepaid interest expense or prepaid feed expense. *Clement v. United*

*States,* 217 Ct. Cl.     , 580 F.2d 422 (1978), cert. denied 440 U.S. (1979).

Nor is the Commissioner unable to deal with a material distortion of income under section 446(b) because of provisions in the regulations exempting farmers from having to use the inventory method of accounting. Sec. 1.471–6(a), Income Tax Regs. The Court of Claims recently considered this specific question in *Clement v. United States, supra,* and held at page     :

we see the Commissioner's refusal to allow deduction of the whole prepayment in 1968—having found that to result in a distortion of income—not as imposing the inventory system, but rather as consistent with the cash system as the latter method is defined by the regulations and utilized for income tax purposes. Treas. Reg. §1.461–1(a)(1)(1957)—expressly prescribing the general rule for the taxable year of deduction for all taxpayers using the cash receipts and disbursement method—declares that "If an expenditure results in the creation of an asset having a useful life which extends substantially beyond the close of the taxable year, such an expenditure may not be deductible, or may be deductible only in part, for the taxable year in which made." Under that specific provision the feed-deduction must be taken, where there would otherwise be a material distortion of income, in the year or years that that kind of asset is consumed or utilized. Such treatment does not mean that an inventory system (applicable to "product costs") is adopted *pro tanto* but only that "period costs" are recognized and melded into the over-all cash accounting methods. See Ward, *Tax Postponement and the Cash Method Farmer: An Analysis of Revenue Ruling 75–152,* 53 Texas L. Rev. 1119, 1153–1155, 1157, 1161 (1975). * * * [Fn. ref. omitted.]

Petitioners' partnership acquired $360,000 worth of feed in the last few days of 1972, several months after realizing a $4.5-million gain on the sale of their trucking business. Most of the feed was consumed over the next 18 months, the remainder was then sold, and petitioners terminated their investment in the cattle-feeding business.

Thus, petitioners were in business for only a year and a half, but their operations were spread over 3 taxable years. In the first year, petitioners' partnership began business after Christmas and was all finished before New Year's. The only transaction engaged in (other than ordering some cattle) was the purchase of $360,000 worth of feed during the Christmas holidays. As a result of this brief 11th-hour flurry, the feed acquisitions slipped under the wire into 1972, matching the deduction nicely with the large unrelated gain of a few months earlier but divorcing it completely from the income produced by the feed over the next 18 months. This clearly resulted in a material distortion of

income, and under the broad powers of section 446(b), discussed above and only recently affirmed by the Supreme Court (*Thor Power Tool Co. v. Commissioner,* 439 U.S.     (1979)), the Commissioner's action in this case was fully authorized.

The majority opinion clearly recognizes that the Commissioner has latitude to deal with a material distortion of income arising from prepaid feed expenses pursuant to section 446(b). However, the majority nevertheless holds that "a substantial legitimate business purpose satisfies the distortion of income test." It then finds a substantial business purpose in all of this 11th-hour paper shuffling concluding that there was no distortion of income.

I question whether the Commissioner's broad powers under section 446(b) are rendered impotent in the face of a material distortion of income simply because a substantial (although subordinate) business purpose is one of the objectives served by the distortion. Nevertheless, even assuming for purposes of argument that this dubious proposition is correct, the finding of a substantial legitimate business purpose on this record is surprising.

Petitioners sold a trucking business in the middle of 1972 realizing capital gains that aggregated nearly $4.5 million. They then looked around for a device to diminish the tax on the portion of this gain includable in income, and invested $360,000 in a cattle-feeding program. As noted earlier, petitioners' partnership began business after Christmas and finished before New Year's, purchasing $360,000 worth of feed during the Christmas holidays.

The majority opinion, in finding a business purpose, places heavy reliance on the testimony of Mr. Hitch (a full-service "farmer" by any stretch of the imagination) that the feed was purchased at the very end of December because "the price was lowest at that point and by purchasing a year's supply of feed in advance the feed price was fixed." Unless petitioners were entering the cattle-feeding business on a one-shot basis to generate artificial tax losses by splitting the deductions and income between separate tax years (an assumption not favorable to their case), we must assume that they contemplated buying feed on an annual basis. If they were willing to assume the interest costs of acquiring feed a year in advance they would presumably want to be buying it at a time during each year when the price would be

the lowest. When is the price the lowest? The majority, again relying heavily on the testimony of Mr. Hitch, tells us that—

the price of feed was lowest after harvest in the autumn months and then rose steadily until harvest the following year except for a slight decline after the first of the calendar year when farms sold grain to raise money for payment of Christmas expenses, taxes and other expenses incurred in the previous December.

In other words, the price was lowest in the early fall at about harvest time, and increased from that point forward until just after the end of the calendar year when the price went down. During this period of several months from the fall through the early new year, therefore, the *one* time when the price would be highest was just before the first of the calendar year. Yet this is the very time that the petitioners purchased their feed.

Petitioners would have been better off waiting until right after the first of the year and then buying enough feed to carry them to the fall harvest. At that time, they could have locked themselves into a cycle of buying that would have enabled them to purchase a year's supply at that point during each year when the price was the lowest.

In locking themselves into an annual cycle of acquisitions at the relatively high prices prevailing at the end of December, petitioners were acting against their business interests to produce a tax loss. I therefore disagree with the majority finding of a substantial business purpose sufficient to negate the material distortion of income that obviously occurred in this case. See *Clement v. United States*, 217 Ct. Cl. , 580 F.2d 422 (1978), cert. denied 440 U.S. (1979).

The cash method of accounting, undoubtedly helpful to some small businesses and farmers' with very simple records, never contemplated the use to which it has been put in this case. Quite simply, the provisions have been exploited and abused by a clever gimmick in a way transcending the purpose of the statute and the intent of Congress.

We have a dynamic and diverse economy providing income to nearly 90 million taxpayers. Congress, realizing that a statute cannot be drafted with sufficient particularity to fully accomplish its purposes while avoiding every potential abuse, specifically designed section 446(b) to permit the law to be administered on a day-to-day basis consistent with its purpose and intent. The broad interpretation given section 446(b) in recent

years (see cases, *supra* and *Thor Power Tool Co. v. Commissioner, supra*) recognizes these fundamental facts. As Judge Learned Hand said in another context:

the meaning of a sentence may be more than that of the separate words, as a melody is more than the notes, and no degree of particularity can ever obviate recourse to the setting in which all appear, and which all collectively create. [*Gregory v. Helvering*, 69 F. 2d 809, 810–811 (2d Cir. 1934), affd. 293 U.S. 465 (1935).]

Unfortunately, the majority has heard the notes but not the melody.

SIMPSON and QUEALY, *JJ.*, agree with this dissenting opinion.

CHABOT, *J.*, dissenting: The majority state: "In short, a substantial legitimate business purpose satisfies the distortion of income test." (p. 1106 *supra*). In the context of Rev. Rul. 75–152 (as analyzed by the majority), that statement effectively renders section 446(b) meaningless. Accordingly, I respectfully dissent.

The majority cite *Sandor v. Commissioner*, 62 T.C. 469 (1974), affd. per curiam 536 F.2d 874 (9th Cir. 1976), as having "recognized * * * implicitly" that such a business purpose satisfies the "clear reflection of income" standard provided by section 446(b).

Although in *Sandor* it was found that tax reduction was the predominant motive for the prepayment there in issue (62 T.C. at 481), it does not follow that subordination of that motive to business considerations is sufficient to override section 446(b). This was made clear in *Baird v. Commissioner*, 68 T.C. 115, 133 (1977), as follows:

While we are not altogether convinced that the tax deduction was not a substantial motive in petitioner's decision to enter into the transaction,[16] we are constrained to uphold respondent's determination whether or not petitioner purposely sought tax relief in the form of a prepaid interest deduction. The existence of a tax motive is but a factor to be considered in determining whether the payment was actually interest, and whether there was an impermissible distortion of income. See *Rubnitz v. Commissioner, supra*. The issue is whether allowance of the deduction would clearly reflect income; "the test of clear reflection of income is intended to be an objective one," *Cole v. Commissioner, supra* at 1105. * * *

---

[16] Petitioners' adjusted gross income for 1970 ($123,449) was considerably higher than he had reported in prior years. (For 1966 it was $36,492; for 1967 it was $67,747; for 1968 it was $53,729; and for 1969 it was $83,957.) For 1970 petitioner reported capital gains in the amount of $20,024 and one item of miscellaneous income of $50,000.

See, e.g., *Resnik v. Commissioner*, 66 T.C. 74, 81–82 (1976), affd. per curiam 555 F.2d 634 (7th Cir. 1977); *Cole v. Commissioner*, 64 T.C. 1091, 1103–1104 (1975), affd. 586 F.2d 747 (9th Cir. 1978); *Burck v. Commissioner*, 63 T.C. 556, 562 (1975), affd. 533 F.2d 768, 773–774 (2d Cir. 1976). Further, if the majority intend to eliminate the material distortion of income standard from section 446(b) only as it applies to farming, the majority fail to tell us of the reason for the distinction.

The Commissioner possesses broad powers in determining whether accounting methods used by a taxpayer clearly reflect income. *Commissioner v. Hansen*, 360 U.S. 446, 467 (1959). Even if an accounting method may be in accord with generally accepted accounting principles, the requirement that the accounting method clearly reflect income is paramount. *Thor Power Tool Co. v. Commissioner*, 439 U.S.     (1979).

The majority note that the cash method of accounting will usually result in some distortions of income, and that over a period of years the distortions will tend to cancel out each other, quoting from *Spitalny v. United States*, 430 F.2d 195, 197 (9th Cir. 1970).

*Firstly*, in *Spitalny*, the Court of Appeals held that the taxpayer therein could not both (1) deduct the cost of feed and (2) exclude gain on sale of the feed upon liquidation (under sec. 337). The court there concluded (430 F.2d at 198) that it did not matter whether the correction of the situation was regarded as a disallowance of a deduction under section 446(b) (the same result for which respondent contends in the instant case) or an application of tax benefit principles.

*Secondly*, there is a big difference between showing that deductions even out over a period of years and showing that tax consequences even out over a period of years. This difference can result from, among other things, the time value of money (e.g., accelerated depreciated deduction provisions designed to encourage investment in depreciable property by reducing the current "value" of the investors' overall tax liabilities), changes in marginal tax brackets (a deduction in a high marginal tax bracket year is worth more than a deduction in a low marginal tax bracket year), and different methods of tax treatment (as illustrated in *Spitalny* by the playoff of ordinary deductions against nonrecognized gains). We may assume that, if the tax

distortions truly canceled out over a number of years in the case before us, the case before us would not be before us.

*Thirdly,* although some distortion clearly is contemplated and acceptable (note the reference in *Spitalny* to "roughly the same result"), respondent is authorized and expected to prevent a material distortion. In the instant case there clearly has been a material distortion of income. *Sandor v. Commissioner,* 536 F.2d at 875;[1] *Baird v. Commissioner,* 68 T.C. at 132; *Cole v. Commissioner,* 64 T.C. at 1104. To paraphrase the language of our opinion in *Resnik* (66 T.C. at 81), in the instant case, the partnership claimed a loss of $360,400. This was the result because the partnership during its 5-day initial taxable year earned no income and neither paid nor incurred any other deductible expenses. This is more than a distortion of income; it is "a distortion of non-income." Petitioners have utterly failed to show that the Commissioner abused the discretion granted to him in section 446(b) of the Code in disallowing the prepaid feed deduction to more clearly reflect income.

The majority also conclude that by disallowing the feed deduction, the Commissioner is attempting to put the partnership on the inventory method of accounting. This is not necessarily the case. Under section 446, the accounting treatment of an item is unacceptable if, in the Commissioner's opinion, it does not clearly reflect income. In the instant case, the Commissioner has used the authority granted him under section 446(b) to determine that the partnership's method of accounting for the $360,400 in prepaid feed expense materially distorts the partnership's income for 1972, the one year before the Court. The Commissioner may use his powers to correct the treatment of an individual item of income or expense. Sec. 1.446–1(a)(1), Income Tax Regs.; e.g., *Resnik v. Commissioner, supra* at 78. Thus the Commissioner may disallow the current deduction and prescribe that under these circumstances the deduction should be taken in a different period in order to clearly reflect income as with items under sec. 1.461–1(a), Income Tax Regs. This power to prescribe the treatment of this item of feed expense because petitioners' treatment does not clearly reflect income does not necessarily determine the appropriate treatment of all feed expense items in future

[1]As the majority note, an appeal in the instant case will lie in the same Court of Appeals that affirmed our decision in *Sandor.*

years. Even Rev. Rul. 75–152, 1975–1 C.B. 144, concerning farmers' deductions for advance payments for livestock feed, provides that generally a taxpayer using the cash receipts and disbursements method of accounting can deduct feed expenses in the year paid. The ruling merely provides that a farmer cannot take a current deduction for prepaid feed expense items that fail to satisfy three tests, one of which is that the deduction not result in a material distortion of income. Also see *Resnik v. Commissioner, supra,* and *Sandor v. Commissioner, supra,* where we upheld the Commissioner's discretion to determine that that taxpayer should be on the accrual method with respect to prepaid interest items which distort income but where it does not follow that that taxpayer is thereby forced on the accrual method for all interest payments in the future.

SIMPSON, *J.,* agrees with this dissenting opinion.