**GOLD–PAK MEAT CO., INC., and Bristol Meat Co., Inc., Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

**No. 71–2659.**

United States Court of Appeals, Ninth Circuit.

Aug. 22, 1975.

---

Sidney D. Krystal (argued), Los Angeles, Cal., for appellants.

Wesley J. Filer (argued), Tax Div., Dept. of Justice, Washington, D.C., for appellee.

## OPINION

Before CHAMBERS and HUFSTEDLER, Circuit Judges, and TAYLOR,* District Judge.

CHAMBERS, Circuit Judge:

Gold-Pak and Bristol are California corporations. Gold-Pak was organized August 7, 1963, and Bristol September 15, 1964. Gold-Pak is essentially a meat packer selling largely to the restaurant trade. It wholly owns Bristol as a subsidiary. Bristol is a cattle feeder. It buys and feeds cattle and sells either exclusively, or almost exclusively, to its parent, Gold-Pak. But Gold-Pak buys from many.

The first fiscal year for Gold-Pak was established as ending May 1, 1964, when Bristol was not yet in existence. Next we have a fiscal year for both ending April 30, 1964, and then for both ending April 29, 1965. For convenience we call the end of each fiscal year as April 30.

From the outset, Gold-Pak's accounting has been on an accrual basis. Bristol qualifies as a farmer and has used, therefore, a cash basis. The tax laws permit farmers to space their receipts and costs with some flexibility based on the timing of sales and purchases when using a cash basis of accounting.

On the fiscal year-end income tax returns for 1965 and 1966, Gold-Pak and Bristol made combined (consolidated) returns which do result in a hybrid situation when Gold-Pak is on an accrual basis and Bristol is on a cash basis.

The commissioner recast the returns to put Bristol on an accrual basis. If this is correct, a substantial amount of tax is due on each of the two tax years remaining in controversy. The commissioner established deficiencies on the two years of consolidated returns, 1965 and 1966. The tax court has upheld the commissioner and rendered a decision against both on the 1965 and the 1966 returns.[1]

The commissioner sees a tax break in the use of the different accounting systems of the parent and child which he finds at the tax year end.

One issue arises this way: there is up to a five-day lag between purchase of livestock by Gold-Pak from all its sellers (including Bristol) and the time of payment. Thus, on the last day of the period for the 1965 return, Gold-Pak owed Bristol $30,500.50 for purchases and in 1965 the sum of $22,041.50 on these items in float. Gold-Pak set them up under its accrual method as new items on the inventory.[2] Bristol, on the cash

---

* The Honorable Fred M. Taylor, United States District Judge for the District of Idaho, sitting by designation.

1. We are not here concerned with Gold-Pak's 1964 single return.

2. On Gold-Pak's books there is no evidence that Gold-Pak in the year of purchase took the accrued item as a net deduction.

basis, did not list the debts to it from Gold-Pak as income. As above stated, the commissioner has taken the view that Bristol has to be on an accrual basis along with its parent.

Also, in the controversy is an item of $244,975.51 which Bristol had paid others before April 30, 1965, for feed and for the feeding of cattle during the coming fiscal year. A portion of this sum represented feed already identified on which title had passed. At the end of fiscal 1966 Bristol had no such prepayments.

As to the unpaid sum for cattle sales, if Bristol had made the same sales to a competitor of Gold-Pak across the street, we would have five days delay taxwise and no one would have said anything about it. We think the trouble here comes from just looking too hard at the parent-child relationship. After so much overstaring, somehow one comes out concluding it is bad.

We would have an entirely different case if we had a gimmick where the parent was simultaneously taking a profit while the child was escaping forever. Here the child postponed his profit, not cutely, but in the regular course of business. And, if one gets what temporarily seems to be a tax break, experience usually shows that sooner or later events catch up with him.

█ We hold that the parent and child did not need pre-return filing permission for the farmer-child and processor-parent to file a consolidated return using the two different accounting methods, but the commissioner could reject the thing if there was some unreasonable distortion of income other than those caused by the child merely being a farmer. We hold that the prior consent requirements of some of the regulations (and which have generally been upheld) are applicable to changes of method of accounting and not to an initial election were one of the group is a farmer.

We see a change in accounting methods from year to year as something on which the commissioner should have a prior peek. And his regulations generally spell that out. Rightly so. But when we deal with initial elections there seems to be no real reason where the commissioner's regulation does not specifically require the prior approval to import it for him. It is enough if he gets to rule on the method when the returns come in.

This logic seems quite supportable when we look at § 1.1502–17, Treasury Regulations, as published Sept. 8, 1966, 31 F.R. 11806, and then contrast it with its original text in § 1.1502–44, as published Aug. 30, 1955, 20 F.R. 6335.[3] The 1966 version saves the commissioner from himself.

█ Under the circumstances here, if consent for the use of the two methods was required, it was unreasonably withheld. We find nothing offensive in the way of distortion on the year end and inter-company sales, all comporting to the pattern of the year long company sales. Presumably, it will be evened out in the long run.

The Treasury Regulation § 1.471.6 gives a farmer a favor which comports with the general beneficence given farmers by the Congress and it is not lightly to be taken away by another regulation. Maybe it should be taken away, but that is not our function.

We hold the deductions for undelivered feed and future feeding by others for Bristol should be reexamined by the tax court under the cash rules applicable. We have not held a farmer on a cash basis can do anything he wants to about paying (and deducting now) for future requirements not in the course of prudent business practice. For example, we assume that a farmer who has a low production cost and gets a huge increase in the price of his product cannot pay fully now for insecticides to be furnished him annually for each of the next 25 years, unless there is some special reason. In other words, each prepaid item

---

**3.** Section 1.1502–44 was renumbered in 1966 as § 1.1502–44A. T.C. 6894, 1966–2 Cum.Bull.

362. The section as renumbered is applicable to tax years beginning before January 1, 1966.

on the cash basis should be examined without regard to who owns Bristol.

We have held the hybrid situation should not be refused or reversed by the Commissioner for those situated in the Gold-Pak—Bristol frame unless it is producing gross distortions. We believe careful reexamination of the prepayments will produce a result that is not gross but decent.

The case is remanded to the tax court for proceedings consistent herewith.[4]

APPENDIX

Pertinent sections of Treasury Regulations:

§ 1.446–1 *General rule for methods of accounting.*

(a) General rule. * * *

\* \* \* \* \* \*

(4) Each taxpayer is required to make a return of his taxable income for each taxable year and must maintain such accounting records as will enable him to file a correct return. See section 6001 and the regulations thereunder. Accounting records include the taxpayer's regular books of account and such other records and data as may be necessary to support the entries on his books of account and on his return, as for example, a reconciliation of any differences between such books and his return. The following are among the essential features that must be considered in maintaining such records:

(i) In all cases in which the production, purchase, or sale of merchandise of any kind is an income-producing factor, merchandise on hand (including finished goods, work in process, raw materials, and supplies) at the beginning and end of the year shall be taken into account in computing the taxable income of the year. (For rules relating to computation of inventories, see sections 471 and 472

[26 U.S.C.A.], and the regulations thereunder.)

\* \* \* \* \* \*

§ 1.471–6 *Inventories of livestock raisers and other farmers.*

(a) A farmer may make his return upon an inventory method instead of the cash receipts and disbursements method. It is optional with the taxpayer which of these methods of accounting is used but, having elected one method, the option so exercised will be binding upon the taxpayer for the year for which the option is exercised and for subsequent years unless another method is authorized by the Commissioner as provided in paragraph (e) of § 1.446–1.

\* \* \* \* \* \*

§ 1.1502–17 *Methods of accounting.*

(a) General rule. The method of accounting to be used by each member of the group shall be determined in accordance with the provisions of section 446 as if such member filed a separate return. For treatment of depreciable property after a transfer within the group, see paragraph (g) of § 1.1502–12.

(b) Adjustments required where method of accounting changed. In any case in which a member of a group changes its method of accounting for a consolidated return year, the provisions of section 481(a) shall be applicable. If the requirements of section 481(b) are met because the adjustments under section 481(a) are substantial, the increase in tax for any prior year shall be computed upon the basis of a consolidated return or a separate return, whichever was filed for such prior year.

(c) Example. The provisions of this section may be illustrated by the following example:

Example. X and its wholly-owned subsidiary Y filed separate returns for the calendar years ending December 31,

---

4. If the tax division finds our concept of the law a little confusing, and it may be, we might retort that our understanding of bovine husbandry is a little better than the Department's.

We find this passage in the government brief: "[I]f it (Bristol) 'sold' only one *steer* to Gold-Pak and Gold-Pak sold the meat from that *cow* for $2,000 . . . ." [Emphasis supplied.]

1965. During calendar year 1965, X employed an accrual method of accounting, established a reserve for bad debts, and elected under section 171 to amortize bond premiums with respect to its fully taxable bonds. During calendar year 1965, Y employed the cash receipts and disbursements method, used the specific charge-off method with respect to its bad debts, and did not elect to amortize bond premiums under section 171 with respect to its bonds. X and Y filed a consolidated return for 1966. For 1966 X and Y must continue to compute income under their respective methods of accounting (unless a change in method under section 446 is made). As amended T.D. 6894, September 8, 1966, 31 F.R. 11806.

\* \* \* \* \* \*

Treas.Reg. § 1.1502–44A. *Methods of accounting.*

(a) *In general.* All members of the affiliated group shall adopt that method of accounting which clearly reflects the consolidated taxable income. A method of accounting which does not treat with reasonable consistency all items of gross income and deductions of the various members of the group shall not be regarded as clearly reflecting the consolidated taxable income. For example, one member of the group will not be permitted to report items of income or deductions on the cash method of accounting while another member of the same group reports the same or similar items on the accrual method. The provisions of this paragraph are subject to the exceptions stated in paragraph (b) of this section.

(b) *Combination of methods.* If the members of an affiliated group have established different methods of accounting, each member may retain such method with the consent of the Commissioner: *Provided,* That consolidated taxable income is clearly reflected: *And provided further,* That intercompany transactions affecting such consolidated taxable income shall be eliminated and adjustments on account of such transactions shall be made with reference to a uniform method of accounting to be elected by the members of the group with the consent of the Commissioner.

(c) *Adjustments required by changes in method of accounting.* In any case in which a member of an affiliated group changes its method of accounting the provisions of section 481(a) shall be applicable. [Reg. § 1.1502–44A.] [Originally published as Treas.Reg. § 1.1502–44, Aug. 30, 1955, 20 F.R. 6335.]

HUFSTEDLER, Circuit Judge (dissenting):

Gold-Pak and Bristol could maintain inconsistent accounting methods under Treasury Regulation section 1.1502–44A only if (1) the Commissioner consented, (2) the methods clearly reflected taxable income, and (3) intercompany transactions affecting the consolidated taxable income were eliminated. The tax court concluded that none of these conditions was met, and its determination is supported by the record.

The Commissioner did not consent. The majority attempts to avoid this fact by arguing that, if consent were required, the Commissioner unreasonably withheld consent. The Commissioner was not asked for advance consent, and his failure to respond to an unasked question cannot be unreasonable. His failure to approve after the inconsistent accounting systems were adopted was not arbitrary. Changes in accounting methods or the use of inconsistent methods between affiliates commonly result in some distortion of taxable income. (*Cf. American Can Co. v. Commissioner of Internal Revenue* (2d Cir. 1963) 317 F.2d 604.) The Commissioner decided that the dual accounting methods used by Gold-Pak and Bristol did distort taxable income. That decision was well within the broad discretion committed to the Commissioner. Our province is not " 'to weigh and determine the relative merits of systems of accounting' " (*United States v. Catto* (1966), 384 U.S. 102,

114, 86 S.Ct. 1311, 1318, 16 L.Ed.2d 398) or to substitute our judgment for the Commissioner's in matters committed to his discretion, even if we think our judgment is better or fairer. (*Cf. Alameda Inv. Co. v. McLaughlin* (9th Cir. 1929) 33 F.2d 120; 8A Mertens, Law of Federal Income Taxation (1971 ed.) § 46.03.)

I would affirm the Tax Court.