T.C. Memo. 1996-433

UNITED STATES TAX COURT

OAKCROSS VINEYARDS, LTD., DENNIS D. GROTH, TAX MATTERS PARTNER,
Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11659-94.  Filed September 24, 1996.

Richard J. Sideman, for petitioner.

Kathryn K. Vetter, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, Judge:  The instant case is a proceeding pursuant to sections 6226-6231 for a readjustment of partnership items of Oakcross Vineyards Ltd. (Vineyards), a partnership, for the taxable year ending December 31, 1990.  In a Notice of Final Partnership Administrative Adjustment, respondent increased Vineyards' income for that year by $1,625,423 and increased the

partnership's self-employment income by the same amount. Unless otherwise noted, all section references are to the Internal Revenue Code (Code) in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issue to be decided is whether respondent's determination that Vineyards must report its income from the sale of grapes and other property on the accrual method, rather than the cash receipts and disbursements method, in order to clearly reflect its income was an abuse of respondent's discretion.

FINDINGS OF FACT

Some of the facts have been stipulated for trial pursuant to Rule 91. The parties' stipulations of fact are incorporated herein by reference and are found as facts in the instant case.

At the time the petition in the instant case was filed, Vineyards maintained its principal place of business in Oakville, California.

General Background

Vineyards

Vineyards was organized on May 26, 1981, as a California limited partnership to acquire and operate a vineyard in California's Napa Valley. Mr. Groth and his wife Judith (sometimes referred to herein together as the Groths) are the general partners of Vineyards and own an 85-percent interest in the partnership. Trusts for the benefit of each of the Groths'

three children are limited partners of Vineyards and own the remainder of Vineyards, each trust holding a 5-percent interest.

Vineyards is engaged in the business of growing wine grapes and is a farmer for purposes of the Code. Vineyards jointly operates two vineyards: the Oakcross Vineyard, a 121-acre parcel acquired during 1981 for $2,180,000, and the Hillview Vineyard, acquired during 1982 for $975,000. Vineyards made downpayments of $400,000 and $250,000, respectively, for each parcel and financed the remainder of their purchase prices with mortgage debt. Vineyards borrowed $301,115 from the Production Credit Association (PCA) for the purchase of the Hillview Vineyard. Since it started business, Vineyards has used the cash receipts and disbursements method of accounting.

Vineyards' operations were initially financed by cash contributions from the Groths, mortgage debt, and annual operating loans. Vineyards obtained operating or crop loans from the PCA during each of the years 1981 through 1988. The loans were repaid each year. During 1988, Vineyards obtained a $300,000 line of credit from Napa National Bank.

During 1990, Vineyards employed, inter alia, a vineyard manager and two assistants. Prior to and during 1990, Vineyards maintained an office in a building on the Hillview Vineyard.

Winery

During 1982, having learned that operating a winery offered greater potential for profit than operating a vineyard, the

Groths decided to enter the winery business. Accordingly, during that year, they established, pursuant to California law, Groth Vineyards and Winery (Winery), an S corporation. Winery is engaged in the business of making and marketing wines, such as cabernet sauvignon, chardonnay, and sauvignon blanc, which are named for the varietal or type of grape from which each is made. Since it started business, Winery has used the accrual method of accounting.

Initially, the Groths owned all of the outstanding shares of Winery's stock. In 1982, the Groths employed a professional winemaker, Nils Venge, as general manager of Winery. During 1990, Mr. Venge was responsible for all production operations of Winery and for supervision of Vineyards' vineyard manager.[1] Mr. Venge's employment contract provided for options to acquire up to 10 percent of Winery's stock, which he exercised as they became available. During each of the following years, Mr. Venge held the following percentage of Winery's stock:

| Year | Percentage |
| --- | --- |
| 1985 | 1.07 |
| 1986 | 2.71 |
| 1987 | 6.28 |
| 1988 | 8.85 |
| 1989 | 10.00 |
| 1990 | 10.00 |

---

[1] In general, a winemaker decides when to pick grapes and must be satisfied with the viticultural practices of the vineyard supplying grapes.

During relevant periods, Mr. Groth was president and secretary of Winery, and Mrs. Groth was vice president and chief financial officer of Winery. The Groths had overall responsibility for all Winery operations. Mr. Groth represents to customers that he controls the production process from the growing of the grape until the cork is put in the bottle. During 1985, the Groths had taken over full-time management of Winery; prior to that time, Mr. Groth had been, successively, a partner of the accounting firm of Arthur Young and Company, the chief financial officer of Atari, Inc., and president of Atari's international division.

Winery was initially financed by the Groths' personal resources. By the end of 1983, their investment in Winery's stock was $900,000, and their loans to Winery totaled $365,390.

Since it was established in 1982, Winery sought to build a physical plant in which to make, store, and bottle its wines. During 1982, Winery undertook to construct a winery plant, investing $220,000, but the project was deferred when financing could not be obtained. During 1982, Winery contracted with another winery to crush and ferment its grapes pursuant to a custom crush contract. During 1983, Winery constructed an open pad in the Oakcross Vineyard for crushing and fermenting grapes, investing $375,000. Winery also relied on the facilities of other wineries during that year for the custom crushing of grapes and the bottling, aging, and storing of its wines.

During 1983, Winery began selling some of its 1982 vintage sauvignon blanc. Once Winery had demonstrated that its wines were salable, during December 1983, Bank of America granted Winery a $500,000 line of credit and an equipment loan of $200,000. As a condition of granting the line of credit, Bank of America required that (1) Vineyards and the Groths subordinate all of the debts owed them by Winery, totaling $893,000, to Winery's obligations to the bank and (2) no payments on those debts be made by Winery without the bank's consent. Vineyards accordingly executed a subordination agreement to induce Bank of America to extend credit to Winery. The bank also required cross-collateralization by Vineyards and personal guarantees by the Groths of the loan. During February 1985, Bank of America increased Winery's line of credit to $1,000,000, and continued to require Winery's debts to Vineyards to be subordinate to Winery's obligations to the bank. Vineyards subsequently executed subordination agreements dated November 14, 1985, and March 31, 1986.

During 1986, Winery was not achieving the sales goals expected by Bank of America, and the bank declined to raise Winery's line of credit to $1,500,000. As a consequence, Winery was put in a difficult financial position. Winery sold some of its 1984 and 1985 vintages in bulk, which fetched a lower price than could have been obtained had the wine been bottled, but which saved costs, as well as unused barrels. During December

1986, Bank of America offered to renew Winery's line of credit in the amount of $1,100,000, subject to continued subordination of Vineyards' claims against Winery to those of the bank and other restrictions on payments by Winery to Vineyards further described below. The terms imposed in connection with the renewal of the line of credit continued until Winery ceased dealing with Bank of America, which occurred during 1988.

During November 1988, Winery negotiated a $1,500,000 line of credit from Napa National Bank, which also agreed to provide a construction loan of $2,200,000 to build Winery's plant and an equipment loan of $550,000. The bank required the same subordination of Winery's debts to Vineyards to Winery's obligations to the bank, the same cross-collateralization by Vineyards, and the same payment schedule as Bank of America had required. During 1990, Winery's plant, which had the capacity to produce 40,000 cases of wine, was completed and occupied. Also during 1990, Winery began using the term "estate bottled" to describe its wines, meaning, inter alia, that Winery controlled the viticultural practices of the vineyards in which the grapes from which the wines had been made were grown.

The following table summarizes Winery's wine sales through 1990:

| Year | Sales |
|------|-------|
| 1982 | $0 |
| 1983 | 28,402 |
| 1984 | 384,921 |

| | |
|------|----------|
| 1985 | 656,293 |
| 1986 | 1,128,384 |
| 1987 | 1,332,803 |
| 1988 | 1,955,474 |
| 1989 | 1,909,743 |
| 1990 | 2,382,294 |

## Activities of Vineyards and Winery

### Dealings between Vineyards and Unrelated Buyers

From 1981 through 1990, Vineyards sold grapes to unrelated buyers, and the sales were made at market value. During 1981, Vineyards sold all of its grapes to unrelated buyers. During certain of the years from 1981 through 1990, long-term agreements with certain buyers for Vineyards' grapes that had been made by the previous owners of its vineyards were continued and new agreements were made. Certain written agreements for the sale of grapes, whether long term or otherwise, were on the purchaser's letterhead, while others were on Winery's letterhead. The agreements on Winery's letterhead generally called for payment of one half of the amount due 30 days after delivery and the balance on January 10 of the year following the year of delivery. The contracts written on purchasers' letterheads provided similar payment terms. Vineyards sent invoices to buyers on Winery letterhead. Mr. Venge executed some of Vineyards' grape purchase agreements on behalf of Mr. Groth.

Vineyards charged and collected interest on the unpaid balances due from unrelated purchasers. Those buyers generally paid Vineyards for grapes within 6 months of harvest, which

generally occurred during September or October of each year. Accordingly, they generally made their final payments for grapes purchased during either the year of purchase or the first quarter of the following calendar year. During 1989 and 1990, unrelated buyers paid for their grape purchases before the end of those years. Vineyards made sales to unrelated buyers in the following amounts from 1981 through 1990:

| Year | Amount |
|------|--------|
| 1981 | $121,349 |
| 1982 | 331,539 |
| 1983 | 104,076 |
| 1984 | 152,983 |
| 1985 | 152,584 |
| 1986 | 189,365 |
| 1987 | 114,385 |
| 1988 | 122,236 |
| 1989 | 122,078 |
| 1990 | 31,486 |

The following table summarizes the relative amounts of the purchase price of grapes received by Vineyards from unrelated buyers during the year of sale and the subsequent year:

| Year of Sale | Percentage Received-- Year of Sale | Percentage Received-- Subsequent Year |
|------|------|------|
| 1981 | 17 | 83 |
| 1982 | 11.6 | 88.3[2] |
| 1983 | 21.4 | 78.6 |

---

[2]  A portion of the amount due Vineyards was not paid until after 1983.

| 1984 | 39.6 | 60.4 |
| 1985 | 16.3 | 83.7 |
| 1986 | 91.8 | 8.2 |
| 1987 | 95.6 | 4.4 |
| 1988 | 93 | 7 |
| 1989 | 100 | 0 |
| 1990 | 100 | 0 |

By letter dated September 15, 1982, Mr. Groth informed one of Vineyards' customers for grapes from the Hillview Vineyard of Mr. Groth's long-term plan to start a winery. The letter further stated that Mr. Groth would need grapes produced by the Hillview Vineyard for that winery and that, for 1983, he wished to sell to the customer only half of the amount of sauvignon blanc grapes specified in the agreement that had been made between the customer and the previous owner of the Hillview Vineyard, and, thereafter, to take all of those grapes for his own winery. During 1985, Vineyards entered into a contract with Renaissance Wine Company for the purchase of grapes that would continue from year to year until canceled; if canceled, the parties were obligated to buy and sell the same amount of grapes at the same price as had been bought and sold during the preceding year. The contract called for the purchase of 50 tons of grapes at $750 per ton. Consequently, the buyer was obligated to buy annually 50 tons of grapes for at least 2 years. In a cover letter with respect to the contract dated March 15, 1985, Mr. Groth stated that "$750 per ton is a price that is below our normal selling price and is designed to help you [Renaissance Wine Company] achieve your average sell price of $36/case."

Dealings Between Winery and Unrelated Growers

From 1983 through 1986, Winery purchased grapes from unrelated growers pursuant to agreements that would continue until canceled. The agreements, which were prepared on Winery letterhead, provided that Winery would pay one half of the purchase price 30 days after delivery of the grapes and the balance by December 15 of the year of delivery. For grapes purchased from one grower during 1983, Winery paid one half of the purchase price during 1983 and the balance during 1984. For grapes purchased from other growers during 1983, and for all grapes purchased during 1984, 1985, and 1986, Winery paid for its purchases by yearend pursuant to the terms of its agreements.

During relevant periods, Winery could not have purchased all of the grapes that it needed from unrelated growers without additional capital. Bank of America did not suggest that the unrelated vineyards from which Winery purchased grapes execute subordination agreements similar to those executed by Vineyards. Winery did not purchase grapes from unrelated vineyards from 1987 through 1990 and purchased grapes only from Vineyards during those years.

A February 5, 1985, letter to Mr. Venge from one of the unrelated growers supplying Winery confirms an agreement to (1) sell Winery 60 tons of chardonnay grapes and (2) review the pricing structure used in the past "and possibly reduce and align

the price per ton to the Napa Valley average."  The letter states that:

> We are always willing to work closely with you should disparities arise in price.  For this reason we will be taking a look at the price per ton of Chardonnay. It would be more of an incentive for us to do this if we know that Groth would buy at least 60 tons of Chardonnay for an additional three years beginning in 1986.

Dealings between Vineyards and Winery

### Grape Sales

During 1982, Vineyards began selling grapes to Winery and continued selling grapes to Winery each year thereafter through 1990.  In general, the amount of grapes that Winery purchased increased each year, and, during 1990, Winery purchased approximately 96 percent of Vineyards' grapes.  Prior to 1991, Winery was not able to use all of the grapes produced by Vineyards.  After 1990, Vineyards did not sell grapes to unrelated buyers.  The percentage of Vineyards' total grape sales represented by its sales to Winery during each year from 1981 through 1991 was as follows:

| Year | Percentage Sold to Winery |
| --- | --- |
| 1981 | 0 |
| 1982 | 29.2 |
| 1983 | 70.8 |
| 1984 | 61.7 |
| 1985 | 68.7 |
| 1986 | 62.1 |
| 1987 | 72.9 |
| 1988 | 83.8 |
| 1989 | 85.7 |
| 1990 | 95.6 |
| 1991 | 100 |

Vineyards sold grapes to Winery at market value. Winery made no payments to Vineyards during 1982 or 1983 for grape purchases because funds were not available. Vineyards sold grapes to Winery during 1983 because Mr. Groth believed that Winery would eventually become successful. During March 1984, Winery made its first payment to Vineyards for 1982 sauvignon blanc grapes used in wine being sold at that time. That payment, and subsequent payments to Vineyards, were made with funds provided by Winery's line of credit from Bank of America, and the bank consented to the March 1984 payment. In deciding whether to approve the payment, the bank considered whether the wines made from the grapes purchased from Vineyards had been released for sale, and Vineyards would be paid 6 months after a wine's release. At that time, Winery customarily released its sauvignon blanc after 1 year, its chardonnay after 2 years and its cabernet sauvignon after 3 years. Winery also produced relatively small quantities of a reserve cabernet sauvignon that was released 1 year after the estate cabernet was released. A subsequent vintage was not released until the prior one had been sold.

By addenda to subordination agreements dated November 14, 1985, and March 31, 1986, that were executed by it, Vineyards consented to receive payments from Winery only for those grapes that had been made into wine that had been released for sale by Winery for a minimum of 7 months. Vineyards acknowledged, however, that payments were allowed only to the extent they did

not jeopardize Winery's ability to meet its obligations to Bank of America.

The terms on which Winery paid Vineyards for grape purchases were further modified in connection with the renewal of Winery's line of credit during December 1986. As a condition of renewing the line, Bank of America required that payments to Vineyards for grapes be made quarterly no earlier than 60 days after each quarter's end and ratably as the wine made from Vineyard's grapes was sold. In a letter dated November 24, 1986, to Bank of America discussing the bank's proposal with respect to the timing of Winery's payments to Vineyards for grapes, Mr. Groth wrote that "Judy and I have provided generous delayed payment terms to the Winery that are still adequate." As noted above, the foregoing payment arrangement between Winery and Vineyards continued for the remainder of the period that Bank of America provided a line of credit to Winery as well as subsequently, when Winery obtained a line of credit from Napa National Bank during November 1988.

During 1986, Vineyards and Winery executed a Grape Payment Calculation that provided, inter alia, that: (1) Vineyards would sell grapes to Winery in quantities as needed by Winery, with Winery having first choice of grapes and Mr. Venge having authority to select among the grapes available and to coordinate sales with unrelated buyers; and (2) payment for the grapes would occur ratably as the wine made from the grapes was sold by

Winery, with payments occurring periodically during the year, but with full payment for actual sales during a year being made no later than the quarter following the year's end.

The following table summarizes the amount of Winery's grape purchases from, and payments to, Vineyards for grapes from 1982 through 1990:

| Year | Amount of Purchase | Amount of Payment |
|------|--------------------|--------------------|
| 1982 | $140,079 | $0 |
| 1983 | 252,665 | 0 |
| 1984 | 246,252 | 40,563 |
| 1985 | 334,738 | 208,746 |
| 1986 | 310,156 | 41,514 |
| 1987 | 308,319 | 425,536 |
| 1988 | 447,752 | 360,930 |
| 1989 | 734,432 | 321,968 |
| 1990 | 714,083 | 435,313 |

The amounts owed to Vineyards by Winery for grapes at the end of each calendar year from 1982 through 1990 are as follows:

| Year | Account Receivable |
|------|--------------------|
| 1982 | $140,079 |
| 1983 | 392,744 |
| 1984 | 598,444 |
| 1985 | 724,435 |
| 1986 | 993,077 |
| 1987 | 875,859 |
| 1988 | 962,681 |
| 1989 | 1,375,145 |
| 1990 | 1,653,915 |

Vineyard's $1,653,915 account receivable from Winery as of December 31, 1990, comprised amounts due for the purchase of the following vintages and varietals of grapes:

| Vintage | Cabernet Sauvignon | Chardonnay | Sauvignon Blanc | Merlot |
|---------|--------------------|------------|-----------------|--------|
| 1986 | $7,311 | | | $1,528 |
| 1987 | 45,413 | | | 10,436 |
| 1988 | 167,513 | $10,177 | | 23,218 |
| 1989 | 315,245 | 229,177 | $80,224 | 49,590 |
| 1990 | 347,070 | 213,360 | 90,143 | 63,510 |

By the end of 1990, Winery had paid only $60,196 with respect to its 1989 grape purchases, which totaled $734,432, and had paid nothing for its 1990 purchases.

### Interest Payments by Winery to Vineyards

Vineyards charged Winery interest on the unpaid receivables from Winery, but Winery paid none of that interest during 1982 or 1983. Beginning in 1984, Winery paid Vineyards some of the interest that had been accruing on Vineyard's receivables from Winery. Pursuant to addenda to the subordination agreements executed by Vineyards that were dated November 14, 1985, and March 31, 1986, Vineyards was permitted to collect interest from Winery on the receivables due from Winery at the rate of 12 percent. Vineyards acknowledged, however, that payments of interest were allowed only to the extent they did not jeopardize Winery's ability to meet its obligations to the Bank of America. Interest payments continued until 1986, when Bank of America required Winery to cease accruing interest on Vineyard's

receivables without the bank's consent as a condition of renewing Winery's line of credit. Furthermore, all accrued and unpaid interest owed to Vineyards was eliminated from Winery's books at the end of 1986 and was never paid to Vineyards.

No interest accrued on Vineyards' receivables for the remainder of the time that Winery dealt with Bank of America. The Grape Payment Calculation executed by Winery and Vineyards during 1986, however, provided that Vineyards would be paid interest at the rate of 10 percent on its receivables from Winery for grape purchases. During November 1988, Winery obtained a line of credit from Napa National Bank, which allowed interest on the receivables to be accrued and paid quarterly. The following table summarizes the accrual and payment of interest to Vineyards on its receivables from Winery for grape purchases from 1982 through 1990:

| Year | Interest Accrued | Interest Paid | Balance |
|------|------------------|---------------|---------|
| 1982 | $4,202 | $0 | $4,202 |
| 1983 | 24,388 | 0 | 28,590 |
| 1984 | 50,729 | 7,017 | 72,302 |
| 1985 | 57,819 | 49,419 | 80,702 |
| 1986 | (79,739) | 963 | 0 |
| 1987 | 0 | 0 | 0 |
| 1988 | 80,616 | 80,616 | 0 |
| 1989 | 100,339 | 100,339 | 0 |
| 1990 | 128,047 | 128,047 | 0 |

Rent Payments by Winery to Vineyards

The land at the Oakcross Vineyard that was used for the crush pad was rented by Winery from Vineyards for $18,000 per

year.  Prior to and during 1990, Winery's offices were located in a building at the Hillview Vineyard, which was rented from Vineyards for $500 per month.  As a condition for the renewal of Winery's line of credit, Bank of America required that payment of rent by Winery to Vineyards be suspended during 1986 and 1987.  After Winery ceased dealing with Bank of America during 1988, rent payments resumed.

## OPINION

The issue to be decided is whether respondent's determination, pursuant to section 446(b), that Vineyards must use the accrual, and not the cash, method to account for its income from the sale of grapes and other property in order to clearly reflect its income constitutes an abuse of respondent's discretion.  Vineyards was a farmer for purposes of the Code and used, pursuant to sections 1.61-4 and 1.471-6(a), Income Tax Regs., the cash receipts and disbursements method of accounting to compute its income.

Respondent contends that use of the cash method materially distorted Vineyard's income because of the large and increasing account receivable from Winery, which did not pay for its grape purchases until wine made from the grapes was released for sale or sold, between 2 and 5 years afterwards.  Respondent points out that Vineyards did not give the same terms to unrelated buyers of its grapes and argues that the deferred payment arrangement served no business purpose of Vineyards.

Petitioner contends that Vineyards was permitted to use the cash method, that the method was generally accepted in the vineyard industry, that it was consistently applied by Vineyards, and that it clearly reflected Vineyards' income. Petitioner argues that it is not required to show a business purpose for the deferred payment arrangement with Winery but that such a purpose exists, namely the establishment of a long-term relationship between Vineyards and Winery. Petitioner urges that the relationship of Vineyards to Winery is irrelevant to the question whether Vineyards may use the cash method of accounting.

Generally, section 446(b) provides that, if a taxpayer's method of accounting does not clearly reflect income, then the computation of taxable income shall be made pursuant to a method that, in the opinion of the Commissioner, does clearly reflect income. Section 446(b) vests the Commissioner with broad power to determine whether the accounting methods used by a taxpayer clearly reflect income, Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 532 (1979), and to require revision of a method that does not clearly reflect income, Commissioner v. Van Raden, 650 F.2d 1046, 1048 (9th Cir. 1981), affg. 71 T.C. 1083 (1979); Cole v. Commissioner, 586 F.2d 747, 749 (9th Cir. 1978), affg. 64 T.C. 1091 (1975); Stephens Marine, Inc. v. Commissioner, 430 F.2d 679, 686 (9th Cir. 1970), affg. T.C. Memo. 1969-39. "An action taken by the Commissioner under section 446 will be set aside by the courts only if there is a clear abuse of discretion." Cole v.

Commissioner, supra at 749; see also Stephens Marine, Inc. v. Commissioner, supra at 686. Accordingly, a determination pursuant to section 446(b) is entitled to more than the usual presumption of correctness, Ansley-Sheppard-Burgess Co. v. Commissioner, 104 T.C. 367, 370 (1995), and cases cited therein, and the taxpayer bears a heavy burden of proof in overcoming a determination that an accounting method does not clearly reflect income, Thor Power Tool Co. v. Commissioner, supra at 532-533. Moreover, even if a taxpayer, including a farmer, is otherwise entitled to use the cash method of accounting, section 446(b) may be used to prevent abuses of the method, Van Raden v. Commissioner, 71 T.C. at 1103, and mere compliance with a generally permitted method does not foreclose the Commissioner's exercise of discretion pursuant to section 446(b), Ford Motor Co. v. Commissioner, 102 T.C. 87, 99 (1994), affd. 71 F.3d 209 (6th Cir. 1995). A taxpayer may challenge the Commissioner's determination on the grounds that its accounting method clearly reflects income, Auburn Packing Co. v. Commissioner, 60 T.C. 794 (1973), and, if the taxpayer's method of accounting does clearly reflect income, the Commissioner may not require a change to another method that more clearly reflects income. Ansley-Sheppard-Burgess Co. v. Commissioner, supra at 371.

Historically, farmers have been allowed to use the cash method, which enables them to employ a simplified accounting procedure. United States v. Catto, 384 U.S. 102, 116 (1966);

Kennedy v. Commissioner, 89 T.C. 98, 103 (1987). Although it is generally acknowledged that distortions of income may result from use of the cash method, Frysinger v. Commissioner, 645 F.2d 523, 527 (5th Cir. 1981), affg. T.C. Memo. 1980-89; Ansley-Sheppard-Burgess Co. v. Commissioner, supra at 374; Rojas v. Commissioner, 90 T.C. 1090, 1107 (1988), affd. 901 F.2d 810 (9th Cir. 1990); Kennedy v. Commissioner, supra at 103; Magnon v. Commissioner, 73 T.C. 980, 1004-1005 (1980), such distortions do not prevent the cash method from clearly reflecting income so long as the method is consistently applied and no attempt is made to unreasonably prepay expenses or defer receipt of income, Ansley-Sheppard-Burgess Co. v. Commissioner, supra at 375; Kennedy v. Commissioner, supra at 103-104; Magnon v. Commissioner, supra at 1005-1006; Van Raden v. Commissioner, 71 T.C. at 1104. Moreover, farmers are allowed great flexibility in timing the receipt of income from harvested crops and may sell them in one year pursuant to a contract calling for payment in a later year. Schniers v. Commissioner, 69 T.C. 511, 520 (1977).

A taxpayer, including a farmer, using the cash method of accounting is ordinarily entitled to report income in the year it is actually or constructively[3] received, secs. 1.61-4(a), 1.451-1(a), Income Tax Regs., but may not do so where application of the general rule results in a material distortion of income. See

---

[3]     Respondent does not contend that Vineyards was in constructive receipt of any of the amounts due it from Winery.

Van Raden v. Commissioner, 71 T.C. at 1102-1103. Where a taxpayer's method of accounting results in a material distortion of income, the Commissioner is empowered by section 446(b) to require use of a different accounting method so that income is clearly reflected. Commissioner v. Van Raden, 650 F.2d at 1048-1049; Burck v. Commissioner, 533 F.2d 768, 773 (2d Cir. 1976), affg. 63 T.C. 556 (1975); Keller v. Commissioner, 79 T.C. 7, 38-41 (1982), affd. 725 F.2d 1173 (8th Cir. 1984); Baird v. Commissioner, 68 T.C. 115, 131 (1977) and cases cited therein; see also Clement v. United States, 217 Ct. Cl. 495, 580 F.2d 422, 430-431 (1978). The question of whether a taxpayer's method of accounting materially distorts or clearly reflects income is one of fact and is to be resolved on a case-by-case basis. Cole v. Commissioner, supra at 749; Ansley-Sheppard-Burgess Co. v. Commissioner, supra at 371; Packard v. Commissioner, 85 T.C. 397, 433 (1985).

The cases that involve the question of whether a material distortion has occurred with respect to the receipt of income take into account the same considerations and factors that are examined in cases involving the question of whether a material distortion has occurred with respect to the claim of a deduction. Compare Ansley-Sheppard-Burgess Co. v. Commissioner, supra at 374-375; Applied Communications, Inc. v. Commissioner, T.C. Memo. 1989-469; C.A. Hunt Engg. Co. v. Commissioner, T.C. Memo. 1956-248, with Van Raden v. Commissioner, 71 T.C. at 1096-1106; Sandor

v. Commissioner, 62 T.C. 469, 479-481 (1974), affd. 536 F.2d 874 (9th Cir. 1976).  Accordingly, we consider cases dealing with material distortions of income arising in connection with the claim of deductions.  In Van Raden v. Commissioner, 71 T.C. at 1105-1106, we set forth the following approach to considering the question whether a distortion of income was material:

> Because the method of accounting and the nature of the trade or business are so interdependent, we conclude that the distortion of income must not be examined in a vacuum but in light of the business practice or business activities which give rise to the transaction which the Commissioner has determined must be accorded a different accounting treatment.  For example, material distortions of income may occur if the sales force of a business is more successful in December than in January, yet such a distortion would not require adjustment to clearly reflect income because the distortion resulted from the business activity itself. * * *

A material distortion of income generally does not occur where a deferral of income arises in the regular course of business and not from a manipulation of the cash method.  Gold-Pak Meat Co. v. Commissioner, 522 F.2d 1055, 1057 (9th Cir. 1975), remanding T.C. Memo. 1971-83.  Courts have also considered whether a business purpose exists for a transaction in deciding whether a taxpayer's method of accounting for the transaction materially distorts income.  Frysinger v. Commissioner, supra at 528; Packard v. Commissioner, supra at 428-430; Van Raden v. Commissioner, 71 T.C. at 1105-1106.  A business purpose exists where the taxpayer establishes a reasonable expectation of receiving some business benefit from the aspect of the

transaction challenged by the Commissioner.  Packard v. Commissioner, supra at 428.  Furthermore, a material distortion of income is likely to be found where the amount of an item differs substantially from what might normally be expected in an arm's-length transaction structured without special regard to tax consequences.[4]  Lewis v. Commissioner, 65 T.C. 625, 629 (1975).  Moreover, we have recognized that the interval of time between the reporting of the payment of expenses and the receipt of associated income can be so great that the use of the cash method of accounting by a taxpayer results in an impermissible distortion of income.  Silberman v. Commissioner, T.C. Memo. 1983-782, affd. without published opinions sub nom. Appeal of David Whin, Inc., Appeal of Giordano, Appeal of Malanka, Stamato v. Commissioner, 770 F.2d 1068, 1069, 1072, 1075 (3d Cir. 1985)

Where related parties deal with each other on the same terms as with unrelated parties, a method of accounting will not be considered to materially distort income simply because the parties to a transaction are related.  Gold-Pak Meat Co. v. Commissioner, supra at 1057.  Nonetheless, it is also well established that transactions between related parties are closely scrutinized.  Spicer Accounting, Inc. v. United States, 918 F.2d 90, 92 (9th Cir. 1990); Hulter v. Commissioner, 91 T.C. 371, 394

---

[4]    We note that an accounting method can produce a material distortion of income even where a taxpayer does not have a tax avoidance motive in employing it.  Anderson v. Commissioner, T.C. Memo. 1975-302, affd. 568 F.2d 386 (5th Cir. 1978).

(1988); <u>Harwood v. Commissioner</u>, 82 T.C. 239, 258 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986); <u>Velvet Horn, Inc. v. Commissioner</u>, T.C. Memo. 1981-227.

We accordingly shall consider whether use of the cash method of accounting to report Vineyards' income from the sales of grapes and other property materially distorted its income. We note at the outset that the Groths were the general partners of Vineyards and held an 85-percent interest in the partnership, with trusts for the benefit of each of their children holding the remaining 15-percent interest. At relevant times, the Groths also owned at least 90 percent of the stock of Winery, with Mr. Venge holding at most 10 percent.[5] As stated above, the fact that the Groths controlled both Vineyards and Winery requires that we carefully scrutinize the transactions between them.

We note at the outset that Vineyards and Winery did not deal with one another on the same terms as they dealt with unrelated parties. Although Vineyards sold grapes to unrelated parties and to Winery at market value, unrelated parties generally paid Vineyards for grapes within 6 months of harvest. The written sales agreements pursuant to which Vineyards sold grapes to unrelated parties that were written on Winery's letterhead generally provided that the buyer would pay 50 percent of the

---

[5]   Pursuant to the employment contract between the Groths and Mr. Venge, Mr. Venge acquired 10 percent of the stock of Winery between 1985 and 1989.

amount due 30 days after delivery and 50 percent during January of the following calendar year. Other sales agreements that were written on unrelated purchasers' letterheads provided for payment of the sale price at similar times, usually determined with reference to the time grapes were delivered. Certain of those agreements provided for payment of a portion of the price, at the latest, during the calendar year following delivery. Generally, unrelated buyers made their final payment for grapes purchased during either the year of purchase or the first quarter of the following calendar year. Vineyards collected interest from unrelated buyers on overdue amounts.

Similarly, Winery's agreements for the purchase of grapes from unrelated growers provide that 50 percent of the purchase price was to be paid 30 days after delivery and the remainder by December 15 of the year of delivery. We consider the foregoing payment arrangements to be the result of arm's-length bargaining between unrelated buyers and sellers.

In contrast, Vineyards allowed Winery more liberal payment terms. During 1982 and 1983, Winery purchased grapes from Vineyards, but did not pay for them because the cash to do so was not available. Vineyards also allowed, or acquiesced in, the control by Winery's lenders of the payment of amounts due Vineyards. Vineyards agreed to subordinate its claims against Winery to those of Bank of America and later to Napa National Bank, but unrelated sellers of grapes to Winery did not. Winery

could not make payments to Vineyards without the consent of its lenders. Winery's first payment to Vineyards during March 1984 was made with the consent of Bank of America with funds provided by a line of credit that the bank had extended to Winery. The test used by the bank to decide whether payment was to be allowed was whether the wine made from Vineyard's grapes was released for sale. The March 1984 payment accordingly was made for 1982 grapes used in wine that had been released for sale approximately 6 months prior to the time of that payment.

Vineyards subsequently consented in addenda to subsequent subordination agreements to receive payment for grapes that had been made into wine that had been released for sale by Winery for a minimum of 7 months. As a condition of renewing Winery's line of credit during late 1986, Bank of America insisted that Winery pay Vineyards for grapes quarterly, but only as the wine made from the grapes was sold. The Grape Payment Calculation entered into by Vineyards and Winery during 1986, provided similar payment terms. That payment arrangement remained in place through the remainder of Winery's relationship with Bank of America and continued when Winery replaced its line of credit from that bank with one obtained from Napa National Bank during November 1988. The foregoing payment practices resulted in an account receivable from Winery to Vineyards in the amount of $1,615,915 as of December 31, 1990, over 80 percent of which was attributable to Winery's 1989 and 1990 grape purchases.

Generally, Winery's payments to Vineyards for grape purchases were deferred between 1 and 4 years after delivery.

Vineyards permitted Winery to defer payment of the interest accruing on Vineyards' receivables from Winery. Vineyards further allowed, or acquiesced in, the control by Winery's lenders of payments to it of interest and rent. During each year from 1984 until 1986, Winery began paying to Vineyards some of the interest accrued on Vineyards' receivables from Winery using funds from Winery's line of credit. Vineyards also made agreements with Bank of America concerning the amount of interest it was entitled to collect from Winery with respect to the receivables. Bank of America, however, as a condition of renewing Winery's line of credit during late 1986, required that: (1) Payments of interest to Vineyards cease; (2) no further accruals occur without its consent; and (3) all accrued and unpaid interest owed by Winery to Vineyards, totaling $79,739, be eliminated from Winery's books.[6] The interest eliminated was never paid to Vineyards. Despite a provision in the Grape Payment Calculation that called for the payment to Vineyards of

---

[6] While petitioner maintains that the interest accrued was eliminated at the insistence of Bank of America, we note that the letter from Bank of America to Winery outlining the terms on which Winery's line of credit would be renewed states that "As Borrower [Winery] has proposed, all existing accrued and unpaid interest owed by Borrower to Guarantors [including Vineyards] is to be reversed and eliminated from Borrower's books by 12/31/86." There is accordingly some question concerning whether the accrued interest was eliminated at the instance of the Bank of America.

interest at 10 percent on the unpaid balance of grape purchases by Winery, no interest was accrued for 1987 by Winery with respect to the amounts due Vineyards.  Winery's rent payments to Vineyards also ceased during 1986.  This was done at the instance of Bank of America.  Once Winery obtained a line of credit from Napa National Bank, however, interest and rent payments resumed.

The foregoing facts demonstrate that Vineyards and Winery dealt with each other on terms that were significantly different from those on which they dealt with unrelated parties.  Moreover, the record indicates to us that the terms on which they dealt were intended to benefit Winery and imposed burdens on Vineyards. Vineyards executed agreements subordinating its claims against Winery to those of Winery's lenders to induce those lenders to grant credit to Winery.  The terms on which Winery purchased grapes from Vineyards were also intended to favor Winery.  For instance, in a November 24, 1986, letter to Bank of America, Mr. Groth wrote that "Judy and I have provided generous delayed payment terms to the Winery that are still adequate."  Without the generous payment terms granted by Vineyards, Winery could not have purchased the grapes it required without the infusion of additional capital.

Winery did not make payments to Vineyards for grape purchases during 1982 and 1983 because funds were not available. Winery began to pay Vineyards after Winery obtained a line of credit during 1984, but payments were subject to the control of

Winery's lenders. These arrangements apparently allowed Winery to use available resources to develop itself. Mr. Groth admitted at trial that "perhaps" Vineyards would have been paid for its grapes sooner had it sold to unrelated parties.

Petitioner contends that Vineyards had a legitimate business purpose for extending such generous payment terms to Winery. At trial, Mr. Groth, a general partner of Vineyards, testified that he sought to establish a long-term relationship with Winery because (1) such a relationship would provide Vineyards with a continuing market for its grapes, and (2) the best prices for grapes tended to be paid on long-term contracts. Mr. Groth also testified that a vineyard would do well if it established a long-term relationship with a successful winery.

The record indicates that grape growers offered favorable terms to large-quantity purchasers given the prospect of developing a long-term relationship with those buyers. Accordingly, we would not consider it unusual if Vineyards offered some accommodation to Winery to foster such a relationship. The record, however, indicates that, when unrelated parties dealt with each other, the inducement typically offered for a long-term relationship was a lower price per ton of grapes purchased, rather than substantial deferral of payment of the purchase price.[7] Accordingly, even if Vineyards had desired

---

[7]    In petitioner's Sur-Reply Brief, petitioner points to a

(continued...)

to accommodate Winery in order to foster a long-term relationship, petitioner has not established that the deferral of payments for grapes was a practice adopted by parties dealing at arm's length.  Furthermore, the accommodations Vineyards gave Winery went even further, including subordinating Vineyards' claims against Winery to those of its lenders and allowing Winery's lenders to control the payment of amounts due for grape purchases, interest, and rent to Vineyards.

Moreover, we note that other factors influenced the development of the relationship between Vineyards and Winery. The record indicates that, as early as 1982, Mr. Groth intended that Vineyards' grapes would supply Winery's needs and that Vineyards' relationships with other purchasers were to be

---

[7](...continued)
Market Segment Specialization Program study of the wine industry prepared by the Internal Revenue Service that was released in April 1995.  Market Segment Specialization Program--The Wine Industry, TPDS 83919Y, reprinted in 37 Tax Analysts Daily Tax Highlights and Documents, at 1971-1989 (May 9, 1995).  Petitioner relies on certain statements in the study to support the contention that the payment arrangements between Vineyards and Winery were widespread in the wine industry.  Although petitioner relies on the study to show facts concerning the practices of the wine industry, the study is not otherwise in the record, nor does petitioner attempt to establish that it is admissible in evidence, and respondent has not had an opportunity to object to its admission.  Petitioner claims that the study has probative value; however, the study, which was released in 1995, does not necessarily reflect the practices of the wine industry in 1990, the year in issue.  Moreover, the study also states, in a portion not relied on by petitioner, that deferred payment practices, which the study indicates occur only between related parties, distort the income of vineyards using the cash method.  Id. at 1980.  Accordingly, we shall disregard the study cited by petitioner.

subordinated to its relationship with Winery.  Also, Winery's control of Vineyards' viticultural practices entitled it to use the term "estate bottled" to describe its wines.  Consequently, the evidence supports an inference that a long-term relationship between Vineyards and Winery could have been established even without Vineyards' generous payment terms.

Because the dealings between Vineyards and Winery are at variance with the practices of unrelated parties with similar objectives dealing at arm's length, we are not prepared to accept that they occurred in the ordinary course of Vineyards' business or were actuated by the business purposes claimed for them. Petitioner has pointed to no nontax benefit received by Vineyards from Winery commensurate with the substantial concessions and accommodations made by Vineyards for Winery's benefit.  Moreover, petitioner has not shown that Vineyards could not have sold, as it did in 1981, all of its grapes to third parties at market value on terms that did not entail the same period of deferral as its sales to Winery.  To the contrary, it appears to us that Vineyards was able to sell to unrelated buyers all of the grapes that Winery did not require without such a deferral of payment of the purchase price.[8]  Accordingly, we conclude that petitioner has not established that there was a legitimate business purpose

---

[8]     Mr. Groth testified that he had significant experience selling Vineyards' grapes to unrelated parties.

for Vineyards' generous payment terms to Winery and that no material distortion of Vineyards' income occurred.

We further conclude that petitioner has failed to establish that respondent's determination that use of the cash method to report Vineyards' income from sales of grapes and other property did not clearly reflect Vineyards' income and that use of the accrual method was required in order to clearly reflect its income was an abuse of respondent's discretion.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.